227 S.W.2d 478 (1950)
ROWLAND
v.
ROWLAND.
No. 27672.
St. Louis Court of Appeals. Missouri.
February 21, 1950.
*479 Herbert W. Ziercher, Clayton, for appellant.
Tyree C. Derrick, and Karl E. Holderle, Jr., St. Louis, for respondent.
BENNICK, Commissioner.
This is an action for divorce which was brought by the husband, Donald M. Rowland, against his wife, Nita Rowland. The latter filed a cross bill in which she asked that she be awarded a decree of divorce from plaintiff. At the hearing of the case the court denied relief to either party and dismissed both the petition and the cross bill. Defendant accepted the court's decision, and neither filed a motion for a new trial, nor has she taken an appeal, with the consequence that there is no longer any question in the case of whether she is entitled to affirmative relief. However plaintiff did file a motion for a new trial; and when the same was overruled, he gave notice of appeal, and thereafter took the necessary steps to cause the case to be transferred to this court, where the case is before us for review upon the sole question of plaintiff's right to the relief prayed for in his petition.
The parties were married in St. Louis, Missouri, on May 21, 1946, when plaintiff was nineteen and defendant eighteen years of age. One child was born of the marriage, a son, Stephen Randolph Rowland, who was born on January 28, 1947, and is now approximately three years of age. The question of the child's custody is one of the issues in this controversy.
Along with most other young married couples in the postwar period, plaintiff and defendant faced a housing problem, and immediately after their marriage they went to live in a boardinghouse at 716 Belt Avenue, where they lived for about three months. From there they moved into a residence at 1163 Partridge Avenue, which *480 was owned by defendant's mother, and was occupied by defendant's sister, Patricia Miller; the latter's three-year-old daughter; and a young woman named Vera Ring, who had been defendant's bridesmaid. Defendant's mother was divorced from defendant's father, and was living in Panama at the time. The sister, Patricia Miller, was also divorced from her husband, but had remarried him by the time of the trial below. During the period of about six months that plaintiff and defendant resided at the Partridge Avenue address they shared all the privileges of the home as well as all the living expenses with Patricia Miller and Vera Ring. As a matter of fact, the division of living expenses proved to be a point of conflict between plaintiff and defendant on the one hand, and Patricia Miller on the other. In this respect both plaintiff and defendant made common cause against defendant's sister, Patricia Miller. It was while they were living at this address that Stephen Randolph was born.
From Partridge Avenue the parties moved to a housing project at Jefferson Barracks, which was available to veterans such as plaintiff, who had been discharged from the army on November 2, 1945. After about six months at Jefferson Barracks the parties moved to a seven-room apartment at 5531 Pershing Avenue, which was owned by a Mrs. Sophie Coppersmith, and was shared by three other persons. After three or four months with Mrs. Coppersmith the parties moved into the home of plaintiff's parents, Mr. and Mrs. A. B. Rowland, at 7484 Gannon Avenue in University City, where they were living on January 23, 1948, when the separation occurred and defendant went with the baby to the Melbourne Hotel.
Plaintiff had known that defendant was going to the Melbourne Hotel, and had in fact given her money for that purpose. However the same afternoon he called at the hotel, obtained possession of the child, and took it back with him to his parents' home, where he was still living at the time of the trial below. Apparently an arrangement had been worked out between the parties by which defendant was permitted to have temporary custody of the child from 9:00 o'clock each Saturday morning until 7:00 o'clock each Sunday afternoon. Her failure to be prompt in calling for the child had been a source of conflict during the time the arrangement had been in effect.
Upon leaving the hotel defendant lived for a while with her friend, Vera Ring, in the latter's apartment at 3971 Gratiot Street. However she later moved into the home of her father, one Elders, with whom she was living at the time of the trial. The father's address was 4118 West Kossuth Avenue. It will be remembered that Elders was divorced from defendant's mother, who was living down in Panama. Elders was a traveling salesman, and was only home over week-ends. The other regular members of his household consisted of his second wife, who was defendant's stepmother; his mother-in-law; and a five or six-year-old child, defendant's half brother, who was not normally developed in respect to his mental reactions. Prior to the time of the trial defendant's stepmother had been staying out on a farm, but occasionally came into the city for a week or so. Defendant testified that she expected her own mother to return from Panama in the near future, and that the two of them would then make their home together in the residence which her mother owned at the Partridge Avenue address.
Upon his discharge from the army on November 2, 1945, plaintiff was employed for a time by the Mallinckrodt Chemical Works. However, in early February, 1946, some two or three weeks after his marriage to defendant, he enrolled in Washington University under the G. I. Bill of Rights and took up a course which required him to major in chemistry. He was still in school at the time of the trial, but expected to graduate in January, 1949. In addition to the assistance he received from the Government by virtue of his status as a veteran, he was also employed in the University book store at an average salary of $70 a month. He reported at school at 8:30 o'clock in the morning, and returned home about 5:15 o'clock in the afternoon. His work in the book store was done between classes. For a time he had worked Saturday afternoons and eight hours on Sunday *481 for one of the metropolitan newspapers, but had later terminated that particular employment. What with his studies at night, plaintiff's time was obviously very much occupied; and the trouble that befell the two young people may be traced in considerable part to defendant's inability to adjust herself to the lack of social activity which her marriage to plaintiff necessarily entailed.
For some three or four months prior to the time of the trial defendant had been employed as a dance instructor at the Ray Quinlan Dance Studio, and had previously had a similar connection with the Bruce Dempsey Studio.
For his cause of action plaintiff charged that defendant associated with other men, and that on January 23, 1948, the very day of the separation, he had found her in a room at the Melbourne Hotel with one Robert Keith; that on one occasion defendant went out with a woman acquaintance and two men, and returned home in an intoxicated condition at 5:00 o'clock in the morning, at which time she informed plaintiff that she had been "out with the boys"; that defendant was of a quarrelsome disposition and frequently quarreled with and upbraided plaintiff without cause or excuse; that defendant did not keep their child clean or give it the proper food, although plaintiff provided the necessary food and clothing for the child; that defendant did not bestow the natural affection of a mother upon the child; and that defendant advised plaintiff that she no longer loved him, would no longer live with him, and intended to secure a divorce, and then separated from him without just cause or excuse on January 23, 1948.
Plaintiff prayed that he be divorced from the bonds of matrimony contracted with defendant, and that he be awarded the custody of Stephen Randolph, the minor child born of the marriage.
Even though in the absence of an appeal on defendant's part there is no issue before us of her right to affirmative relief upon her cross bill, the evidence she presented is none the less material upon the question of whether plaintiff was an innocent party so as to be entitled to a divorce.
In her cross bill defendant charged that plaintiff constantly nagged at her and found fault with her without just cause or excuse; that on numerous occasions he was abusive towards her and struck and beat her; that he was possessed of a violent temper and extremely jealous nature, and on many occasions falsely accused her of improper relations with other men; that his violent temper had induced him on numerous occasions to manifest such violent hatred for her as to cause her to fear for her life; that he criticized her female friends, and refused to allow her to associate with them; that on occasions he drank intoxicating liquor to excess, and in many instances, while under the influence of liquor, he had not only threatened her with great bodily harm, but had also threatened to commit suicide, thereby causing her great mental anguish; and that on the day of her separation from plaintiff he falsely accused her of infidelity when he found her in a hotel room with a friend, and forcibly took the baby from her and placed the child in the custody of his parents against her wishes and without reason for such action.
In considering the sufficiency of the evidence to support plaintiff's charge that defendant had subjected him to such indignities as to render his condition in life intolerable, one is immediately impressed by the fact to which we have already alludedthat the several specific matters of misconduct with which defendant was accused all grew out of and were related to one fatal weakness on her part, that is, her unwillingness to assume the burdens and obligations of matrimony and to accept the limitations upon her social life which her marriage to plaintiff had entailed, especially so long as he was a student at the University with his time almost completely occupied with his studies along with the necessity of earning a living for himself, his wife, and his child.
Defendant's inability to adjust herself to the restraints necessarily imposed upon her manifested itself primarily in two respects, *482 the one, in the choice of her associates, and the other, in her neglect of her child.
One incident which figured largely in plaintiff's complaints occurred in early October, 1947, while the parties were living in Mrs. Coppersmith's apartment on Pershing Avenue. According to plaintiff's evidence defendant told plaintiff that particular evening that she was going to a show with a girl friend and would return about 11:00 or 11:30 o'clock, but instead she did not return until about 4:30 the following morning, and came in with her hair disarranged, the top button missing from her dress, her shoes and stockings removed, and the smell of liquor on her breath. Plaintiff had of course undertaken to look after the baby while she was away.
According to defendant's version of the incident, defendant had met Vera Ring by prearrangement, and had then gone with her to the Crown Room of the Kingsway Hotel, where they were joined by one of Vera's acquaintances named Betty Hess. Vera was drinking beer and defendant highballs, while Betty Hess restricted herself to "cokes". Vera testified that each of them had had only two or three drinks at the Crown Room, but could have had more except that when one of the party is drinking "cokes", it "slows you up".
After a couple of hours in the Crown Room the three of them went to the Zodiac Room of Hotel Chase, where they had a couple more drinks, and then at the conclusion of the midnight floor show they went to a bar and grill in East St. Louis, where they had at least one additional drink. Leaving this place they elected for some unexplained reason to return home by way of the Jefferson Barracks Bridge, and they arrived home about 4:30 o'clock as plaintiff had testified. Vera Ring denied that any of them were intoxicated on such occasion, but admitted that they "might have been feeling good".
While insisting that there had been no men with them on the evening in question, both defendant and Vera Ring admitted having told plaintiff that there were men in the party. Defendant attempted a quite implausible explanation of why she had made such a representation to her husband when it was allegedly not the fact. She complained that "when he was studying I would just sit around and twiddle my thumbs after the baby had gone to bed, and I had nothing to do". According to her account of the incident, Vera Ring had suggested that they go out together, but plaintiff had opposed her being with Vera. She then testified that after a prolonged argument, plaintiff had finally told her to go to a bar with the girls and pick up some fellows with whom to drink and dance, and that he would not care what time she returned home. She opposed such an idea, but when she started to leave the house he slipped her wedding and engagement rings off of her finger, and repeated his proposal. When she returned home at 4:30 o'clock in the morning, she went into the kitchen to undress so as not to disturb plaintiff and the baby, and by this explanation undertook to account for her personal appearance when plaintiff awoke and saw her. He then began "practically pleading" with her to confess that she had been out with men, and in order to quiet him and get to sleep, she at last gave in and told him that she had been "out with the boys", although such statement was untrue. As for Vera Ring, she testified that the reason she had so informed plaintiff was because defendant had instructed her to do so. Suffice it to say that plaintiff categorically denied having suggested to defendant that she go out with other men.
Plaintiff also complains about finding defendant in the hotel room with Robert Keith in the afternoon of the day on which they separated.
As we have already mentioned, plaintiff was aware that defendant was going to the hotel; and if she was determined to leave him, he had preferred that she go to the hotel rather than take the baby into her own father's home where it would have been put into contact with Elder's undeveloped child. He was told the room number at the desk, and when he went to her floor and knocked on the door, she informed him that she was undressed and could not allow him to enter. Defendant insisted that she was not undressed, but was merely endeavoring to stall for time. He replied that *483 he desired to see the baby, and meanwhile he had heard a man's voice in the room. Defendant then told him that she would get dressed and come downstairs, and after a period of about fifteen minutes, she opened the door, whereupon he stepped through and saw Keith inside the room. Plaintiff had known Keith in high school, and not only had their personal relations never been pleasant, but there was the further fact that defendant had kept company with Keith during all the time that plaintiff had been in the army. Plaintiff asked Keith to leave, which Keith, did and then plaintiff picked up the baby and took it with him to his parents' home.
Defendant's explanation, in which she was corroborated by Keith, was that she had called Keith to have him recommend a lawyer whom she might employ to represent her in the prospective action for divorce. There seems to be no doubt that she did have this purpose in mind. Keith's wife had formerly worked for a lawyer whom defendant did at first employ when this action was instituted. There was the further explanation to the effect that she had desired to see if Keith had connections of any sort that would enable him to have some fuel oil supplied to Vera Ring's home, where defendant intended to go with the baby upon checking out of the hotel. There was a dispute as to whether plaintiff had made accusations against defendant in Keith's presence, but he admits that after Keith had gone he charged her with indecent conduct in being locked in a room with another man. Since defendant had already separated from him, he was apparently not so concerned about defendant's own position as he was about her disregard for the position in which she was placing his infant son, who was the innocent victim of the compromising situation.
The record would hardly justify the belief that defendant had brought Keith to her room for any purpose other than that to which she testified. However the incident does at least reveal her indiscretion and indifference to the conventions in her association with the opposite sex, and along with all the other evidence, demonstrates her inclination to follow a course of conduct which was properly most distasteful to plaintiff, and was readily calculated to cause him to be most suspicious of her.
The same is also to be said of her subsequent association with one Tommy Phillips, who was an instructor at the same dancing studio as that at which she was employed. It is true that her acquaintance with Phillips did not come until after the institution of this action, and played no part in causing the separation. Nevertheless she was still plaintiff's wife; and her conduct with Phillips, even if not in any way responsible for the wrecking of her marriage, was none the less material upon the question of her fitness to have the general custody of the child. Plaintiff found pictures of his wife and Phillips in an automobile which she was regularly driving. A check with the authorities disclosed Phillips' identity as the owner of the car, and later plaintiff and one Martineau observed them leave the studio hand in hand, and then followed them to several places throughout the city. Defendant was accustomed to call in the automobile to get the baby, and on several occasions plaintiff saw articles of her clothing scattered about in the car. Vera Ring attempted to show that Phillips was her "boy friend" and not defendant's, but her explanation was not particularly convincing.
In fact, defendant's fondness for Vera Ring had been a constant source of friction between plaintiff and defendant. It was shown that at the time of the trial, Vera Ring, a young woman only twenty years of age, was living in the apartment of one Frank Hopgood, whom she had met at the Zodiac Room of the Chase Hotel, and who she claimed had given her permission to occupy his apartment while he was away from the city for a period of weeks. While Hopgood's name still appeared on the mailbox, Vera Ring insisted that she paid the rent.
And not only was plaintiff resentful of his wife's associates both male and female, but he was equally distressed at her treatment of their child. She was remiss in following the formula for its food, and she was customarily neglectful in such matters as changing its diapers as often as she *484 should. Mrs. Coppersmith testified that during the time the parties lived with her, "every time she [defendant] would feed the child the dog was right there, and the child would eat from the spoon and she would feed the dog with it, and then feed it back to the child". If the testimony of any of plaintiff's witnesses might be discounted in any measure because of their relationship to him, the same could not be said of Mrs. Coppersmith, who was entirely disinterested so far as the record discloses.
As we have already pointed out, the whole picture revealed by the record in this case is one of a young girl contracting a marriage totally outside her own background and experience, and one for which she was not prepared to make the sacrifices that would be required for such a marriage to succeed. She told plaintiff repeatedly that she would leave him unless he quit school so that he could "take her out" more frequently; and on the morning when she finally announced her intention to separate, she frankly told plaintiff's parents that she "was going to leave Don, divorce him, because she was tired of his studying, and wanted him to quit school and get a job so he could go to work and get some money so they could have a good time". With such an attitude on her part it was not unexpected that she should have been guilty of the type of conduct with which plaintiff charged her, and should have inflicted such indignities upon him as to have rendered his condition in life intolerable.
However it was not enough for plaintiff merely to prove that he was an injured party, but for him to be entitled to a divorce it was necessary for it to appear that he was at the same time an innocent party. Kistner v. Kistner, Mo. App., 89 S.W.2d 106; Jones v. Jones, Mo. App., 164 S.W.2d 158; Rusche v. Rusche, Mo.App., 200 S.W.2d 577. This does not mean that his conduct towards and his treatment of defendant need on all occasions have been letter-perfect and above all reproach, for if this were so, few divorces, if any, could ever be granted. Stevens v. Stevens, Mo.App., 158 S.W.2d 238; Jones v. Jones, 208 Mo.App. 632, 235 S.W. 481. On the contrary, the conduct of one party will not prevent him from being adjudged an innocent party unless his conduct was such as to entitle the other party prima facie to a divorce. Stevens v. Stevens, supra; Tebbe v. Tebbe, 223 Mo.App. 1106, 21 S.W.2d 915. It must be shown that he was guilty of a continuous course of conduct connoting settled hate and a manifestation of alienation and estrangement, and proof of mere occasional acts or words will not suffice. Hoffman v. Hoffman, Mo.App., 224 S.W.2d 554. Nor is a party to be denied a divorce to which the evidence shows that he is otherwise entitled if his occasional outbursts and lack of complete control over his own actions are plainly induced by the wrongful conduct of the other party. Kolaks v. Kolaks, Mo.App., 75 S.W.2d 600.
Defendant testified to three instances when plaintiff had allegedly inflicted physical violence upon her. Two of these are said to have occurred while the parties were living at Jefferson Barracks, and the other while they were living with Mrs. Coppersmith. Plaintiff admits the one incident, which occurred when defendant had taken the baby and had gone to the fair at the Barracks with one Curran. Plaintiff had no objection to her being with Curran, and had consented that she go to the fair with the assurance that she would have the baby home for bed by 8:00 o'clock. It had been necessary for plaintiff to remain at home and study for his course at the University. Defendant did not return until 10:00 o'clock, and in his exasperation plaintiff tossed a book towards her and struck her lightly on the back. He denied her claim that he had ever poured water over her head, or that he had slapped her in the course of an argument at Mrs. Coppersmith's. He admitted that he had had numerous arguments with her over her neglect of the baby and her lack of consideration for him; and while the law does not approve anything in the way of violence on the part of one spouse towards the other, the one isolated act when plaintiff tossed the book against defendant would not entitle her to a divorce.
There is a complaint that on one occasion plaintiff drank wine to excess. The occasion was one when plaintiff returned *485 home on his birthday and was disappointed upon finding that defendant had taken the baby and gone away. Defendant also charged that plaintiff customarily made derogatory remarks about her family. Apparently he was fond of her father, but disliked her mother, whom he had occasion to see in bed with a soldier. It will be recalled that the father and mother were divorced. Unquestionably the relationship between plaintiff and defendant was a most unhappy one, but plaintiff is not to be condemned because of his resentment at defendant's unwillingness to assume the obligations which marriage had imposed upon her. Within the concept of the law he was not only an injured but also an innocent party, and entitled to the entry of a decree in his favor.
As we have already pointed out, the judgment is not to be disturbed in so far as it denies defendant relief upon her cross bill and directs that the cross bill be dismissed, but it should be reversed and the cause remanded with directions to the lower court to award plaintiff a divorce upon the cause of action set up in his petition. Having denied relief to both parties, the court could make no provision in its judgment for the custody of the minor child. However the best interests of the child require that plaintiff shall have its general custody, with suitable provision made for such temporary custody or reasonable visitation on the part of defendant as the present circumstances of the parties may make expedient. The details of such an order cannot be arbitrarily fixed by this court, but should be left to the lower court in collaboration with counsel for the respective parties, and upon the presentation of such additional evidence as may be required. Other incidental questions may conceivably arise to which the court's attention will in no sense be foreclosed.
It follows that in so far as the judgment was in defendant's favor upon plaintiff's cause of action, the same shall be reversed and the cause remanded for further proceedings in accordance with the views herein expressed. The Commissioner so recommends.
PER CURIAM.
The foregoing opinion of BENNICK, C., is adopted as the opinion of the court.
The judgment of the circuit court is, accordingly, reversed in so far as it was in defendant's favor upon plaintiff's cause of action, and the cause is remanded for further proceedings in accordance with the recommendations of the Commissioner.
ANDERSON, P. J., and HUGHES and McCULLEN, JJ., concur.