246 S.W.2d 832 (1952)
GARTON
v.
GARTON.
No. 21722.
Kansas City Court of Appeals, Missouri.
March 3, 1952.
John T. Martin, Martin & Gibson, Sedalia, for appellant.
*833 Paul Barnett, David Skeer and Barnett & Skeer, all of Kansas City, for respondent.
CAVE, Judge.
This is a divorce suit. The petition alleges that plaintiff at all times treated the defendant with kindness and affection and faithfully performed his duties as defendant's husband, but that the defendant disregarding her duties as plaintiff's wife offered him such indignities as to render his condition in life intolerable. The indignities charged relate to alleged misconduct on the part of the defendant with other men, including the act of adultery. The answer denies the charges of improper conduct; denies that plaintiff treated her with kindness and affection and faithfully discharged his duties as her husband, and affirmatively alleges that the defendant has at all times faithfully demeaned herself as the wife of plaintiff and has treated him with kindness and affection. She does not pray for a divorce or any affirmative relief other than that plaintiff's petition be dismissed. The trial resulted in a decree of divorce for plaintiff, and defendant appeals.
The case was tried as if the answer had alleged affirmative recriminatory matters, and we shall dispose of the case as though such issues were specifically pleaded. Brackmann v. Brackmann, Mo.App., 202 S.W.2d 561, 566.
Defendant makes two principal assignments: (a) That the evidence shows the plaintiff is not an innocent party within the meaning of the statute relating to divorce and, therefore, he is not entitled to a divorce; and (b) that the evidence is insufficient to prove such misconduct of defendant which would entitle plaintiff to a divorce were he an innocent party.
Briefly stated, the rule is that one spouse may not be denied a divorce on the ground of his or her misconduct unless it would entitle the other spouse to a divorce had he or she been free from blame. Rowland v. Rowland, Mo.App., 227 S.W.2d 478, 484; Rusche v. Rusche, Mo.App., 200 S.W. 2d 577, 584; Patterson v. Patterson, Mo. App., 215 S.W.2d 761.
A brief sketch of the over-all picture shows that the parties were married on February 17, 1950, and spent three days together at that time; later in the month they spent one day and night together; in June they spent three days together; in September one night, and on November 15 were together for one night for the last time. This suit was filed January 24, 1951.
Plaintiff was a dental officer in the United States Navy, commissioned as a Lieutenant Commander, and defendant was a civil service employee. They were both stationed at the Great Lakes Naval Training Center, near Chicago, Illinois, and became acquainted in December, 1947. Plaintiff was 35 and the defendant was 25 years of age. Some months after their first meeting the acquaintance ripened into regular association, and on Labor Day week end of 1948 they were at the home of defendant's parents in Russellville, Indiana. On this occasion plaintiff proposed marriage and the defendant accepted. They agreed that the wedding should be postponed until the plaintiff completed a tour of sea duty to which he expected to be shortly assigned. He received such assignment in October, 1948, and moved to Boston where his ship was being commissioned. The parties corresponded, and at Christmas, at plaintiff's invitation, defendant visited him in Boston. Soon thereafter his ship undertook a European cruise and the parties continued to correspond. When plaintiff ascertained that his ship would dock in Newport, Rhode Island, in February, 1950, he wrote the defendant to meet him there and they would be married. Defendant made the trip to Newport with her mother and met the plaintiff, but he made no mention of marriage during the first few days, and finally defendant told him that if he did not intend to marry her she would leave and their association would end. The next morning he appeared at the hotel where defendant was staying and professed his love for her and a continuing desire to be married. They were married February 17. This was on a Friday, and the parties spent that night, Saturday night, Sunday and Sunday night together. His ship left early Monday morning for a scheduled cruise to Cuba, *834 but was to make a short stop at Norfolk, Virginia. Defendant went to Norfolk and the parties were together one night and the following day. At the meeting in Norfolk it was agreed that the defendant should return to her work at Great Lakes to await plaintiff's completion of his tour of sea duty and his re-assignment to a shore station. The defendant wanted to complete her 5-year service in order to retain a permanent civil service status.
Plaintiff's ship returned to Norfolk March 26. In his testimony he was somewhat critical of defendant for not meeting him at that time, but there is nothing in the record to indicate that defendant knew his ship would return on that date or how long it would be in port. On March 31 he wrote her a long and affectionate letter and told her that his mother and aunt had rented an apartment in Norfolk and that he was living with them when he was off ship duty. He gave her his approximate schedule to the effect that he would be in Norfolk until April 18, then out to sea, and would return the latter part of April and be there until May 12; that he would be gone until May 27 and would be in Norfolk until about June 25, and would then be gone until July 8. He hoped to be relieved of sea duty sometime in July or August. He stated that he did not think it advisable for her to come to Norfolk during the "short stretches" he had in port, and called to her attention that she could get only a short leave and it would be best "to save it until when I come in June."
In May plaintiff wrote the defendant that he would soon have a 10-day leave; that he had to go to Washington, D. C. first, and would then come to Great Lakes and take her to her home in Russellville or would meet her in Russellville. They met in Russellville on a Saturday and he remained with her until the following Tuesday when he left for his home in Sedalia, Missouri. He returned to Norfolk without again seeing his wife on that trip. On June 12 he wrote telling of his visit to Missouri and what a good time he had had sight-seeing and visiting old friends. Defendant testified that she was hurt and offended because he did not spend all of his leave with her or take her to Missouri with him.
The next letter introduced was dated July 19 and it overflows with love and affection. He stated that in a short time he would get shore leave and would arrange for an apartment for them in Portsmouth, Virginia; that he would then go to Sedalia and get some of his things and come through Russellville and get her and the things which she wanted to take for their apartment. Defendant quit her employment at Great Lakes in mid-July and went to her home in Russellville to wait for plaintiff to come for her. On July 21 he wrote her another affectionate letter. On August 3 he wrote that his leave began that day; that he would be in Norfolk about a week and would rent an apartment for them and then come for her. On the contrary, he went to Sedalia and spent two or three weeks with his mother and took her back to Norfolk on September 1. The reason he gave for not taking defendant to Norfolk with him at that time or communicating with her, was because of facts now detailed. He testified that while he was on sea duty he had received letters from his wife in which she mentioned having been at the Officers' Club and at dances in company with other people; that he learned that she was drinking with the officers and visiting with the men at the gate and frequently smiled at "the naval officers and bell hops"; that she had left a theater and talked with a petty officer for an hour and a half; that he had also learned from a detective, whom he had employed in Chicago, that when his wife left her employment at Great Lakes to go to her parents' home in Russellville that she had made the trip in a car with a married man; that when they left her apartment in Waukegan they had driven towards Chicago. In fairness to the defendant, we will say that she wrote plaintiff telling him of this trip, but plaintiff testified that she did not tell him that she knew the man and his wife, but had spoken of him only as a salesman, and that he lived near her apartment. Defendant testified that she told him she knew this man and his wife; that he was going *835 to a place near Russellville to get his wife and had voluntarily asked her to ride with him. Defendant did not deny frequenting the Officers' Club. Plaintiff testified that the more he thought of these occurrences, the "madder" he got. It is quite evident that the deadly virus of suspicion and jealousy had infiltrated his mind and possibly caused him to magnify such occurrences, but it cannot be said he had no basis for his suspicion.
When defendant heard nothing from the plaintiff after his letter of August 3, she went to Norfolk about September 1 and found him at his mother's apartment. He admitted that his wife seemed in great distress, but that they said only a few words to each other at that time. On the next afternoon he went to see her at the hotel where she was stopping and mentioned that he wanted a divorce; that his wife seemed surprised and wanted to know his reason for such action. They discussed the above occurrences but she firmly denied there was anything wrong and again explained the whole situation to him. After some further conversation they had dinner together and returned to her hotel and talked for several hours and he spent that night with her. He left the next morning promising to return, but did not, and refused to talk with her on the telephone.
Shortly after plaintiff spent the night with defendant in September, he reluctantly made an allotment to her of one-third of his salary as a commissioned officer in the Navy. She wanted two-thirds of his salary but he objected to this and thought the allowance should be $120 a month, considering her salary (she was employed at Norfolk navy yards at that time); however, a legal officer of the Navy advised him to make an allotment of one-third, which amounted to $215 a month. This, together with defendant's salary, gave her a larger income than plaintiff was receiving. She was receiving this allotment at the time of the trial.
About that time plaintiff employed a private detective agency in Norfolk, operated by a Mr. Branch, to shadow defendant's activities. Branch and his operators, Barrow and Messick, testified to certain observations they made of defendant's conduct during the next three months.
Barrow testified that on Ooctober 14, 1950, about 8:40 p. m., he saw defendant enter an automobile in front of her apartment with a man; that they returned to the apartment about 12:30 a. m., and were observed hugging and kissing before defendant left the automobile.
Branch, Messick and Barrow testified that on October 28, about 7:30 p. m., they saw defendant come out of her apartment and go to a grocery store; that she entered the store, came out and stood for a short time and looked about; that she then turned on a dark cross-street, walked to the next corner and turned and walked along the street to about the middle of the block where she got into a parked car with the same man they had seen her with on October 14, and they drove away.
Witnesses Branch and Barrow testified that on the evening of December 29, 1950, about 10:00 p. m., from a position on the ground in the rear of defendant's apartment house, they looked through a window of defendant's second floor apartment and saw her hugging and kissing some man, and that they saw the same man leave the apartment about 3:00 a. m.
Barrow testified that on December 31, 1950, he saw the defendant at the Officers' Club dancing and having drinks at the bar and that they left there about 2:30 a. m.; later that night he saw lights in her apartment, and that about 6:00 a. m. he saw the man she had been dancing with at the club leave the apartment.
Witnesses Branch, Messick, Barrow and the plaintiff testified regarding certain activities which took place on the night of January 6 and the early morning of January 7, 1951. This testimony was to the effect that they saw the defendant enter her apartment at 1:30 a. m. with an officer of the Italian Navy; that they later saw the lights in the apartment turned off, at which time they telephoned the plaintiff, who was at his apartment, and he arrived on the scene about 3:30 a. m. Barrow went to the rear of the apartment house and the others went inside to the door of plaintiff's apartment; that Branch knocked at the door *836 but there was no response; they did hear some noises and movement within the apartment, which seemed to come from the bedroom; that Branch left the door and went to locate Barrow; that, in the meantime, Barrow apprehended the Italian naval officer as he left the apartment by a rear stairway; that Branch and Barrow brought the Italian officer back to defendant's apartment door, at which time plaintiff knocked and defendant opened the door; that a time interval of about 20 minutes elapsed from the time Branch knocked at the door and the time plaintiff knocked; that when the apartment was entered defendant had on a coat over her slip but had no other clothes; was wearing no shoes, and her stockings were hanging down; that the covers of the bed were turned back and the bed was "mussed up"; that the spread covering a couch in the living room was wrinkled and disturbed; that plaintiff picked up a "garter pin" on the couch and the defendant "gave him a dirty look" and snatched it out of his hand; that both the defendant and the naval officer denied any wrong-doing, but later the naval officer stated, in the presence of the defendant, that when the first knock was given at the door she had told him to "get his clothes on and go, go"; that the naval officer also stated that defendant had asked him in for a sandwich and, in explanation of his acceptance, said: "she woman, me man, me human."
We now consider defendant's testimony concerning the above occurrences. She admitted that she had met a Lieutenant Keen at the Officers' Club and had three or four "dates" with him, and that she had kissed him good night on two or three occasions; she denied that there was a man in her apartment on the night of December 29, as testified to by the detectives, but admitted that on New Year's night a Dr. Smaller was in her apartment. She stated that a school teacher, whose acquaintance she had made, invited her to attend, as one of a group, a New Year's party at the Officers' Club; that she met Dr. Smaller there for the first time; that he was a member of the party; that during the course of the evening she talked with him about the trouble with her husband; that Dr. Smaller volunteered to escort her home, and when they got to the apartment she invited him in for coffee and sandwiches; that she thought they arrived at the apartment about 2:30 a. m., she did not know just what time he left and did not deny the testimony of the detectives that it was approximately 6:00 a. m.; that she admitted that she kissed him good night, but denied that there had been any improper relations with him. Concerning the night of January 6, 1951, she testified that she had gone to the Officers' Club, had watched a television program and visited with various people until about 1:00 a. m.; that she left the club alone, intending to catch the 1:15 bus; that she missed that bus and knew it would be about 20 minutes before another came along; that she went into a restaurant near the bus stop and saw an Italian naval officer, whom she had seen earlier in the evening at the Officers' Club, and he invited her to sit at a table with him; they sat and talked until about 2:30, when he escorted her home in a taxicab; that when they arrived at her apartment she invited him in to have coffee and sandwiches; that he hung his coat and hat on a rack just inside the door; that they had been there but a few minutes when she got out of her closet to exhibit to him a ship model and a doll her husband had sent her from Europe; that she was showing these items to the officer when she heard a knock at the door; thinking it was her husband and not wishing him to know the officer was in her apartment, she took off her shoes and tip-toed down the hall to the door to obtain his coat and hat and then put him out the back way; that she then went to the door, pulled aside the curtain and looked through the glass, but could see no one in the hall; that believing it was her husband and that he might come back, and in order to make it appear that she had been in bed as an excuse for not answering the door, she took off her dress and all her clothing, except her slip, turned the bed clothes down and wrinkled the covers; that when a second knock came she went to the door, opened it, and invited her husband and those accompanying him into the *837 apartment. She also testified that the door to the apartment was not locked on this occasion; that after her husband and the detectives entered the apartment everyone was talking and she remembered telling her husband she "was innocent of what he thought. * * *. I said this man was innocent. I do remember telling my husband it was my fault for bringing the man up there." She denied that she had had sexual relations with any man except her husband.
Defendant's own admissions convict her of conduct which would entitle her husband to a divorce. The most lenient and charitable construction of the evidence is that defendant was guilty of the very height of indiscretion; that she violated even the modern and liberal moral standards. It is unnecessary to further classify her actions.
Defendant first complains that plaintiff did not advise her of the movements of his ship in and out of port at Norfolk during the spring, and did not invite her to spend some time with him when he was in port. However, in his letter of March 31, he gave her the approximate dates when he would be in port but suggested that it would not be advisable for her to come to Norfolk during such "short stretches" (in port) in view of the fact that she could get only a short leave from her work. Considering the situation of these two parties at that time, we are not impressed with this criticism. However, she complains that when the plaintiff had a 10-day leave in June, he spent only three or four days of that time with her and the remainder of the time with his mother in Sedalia, and that he did not ask her to go to Sedalia with him. It is in evidence that plaintiff's mother was in ill health and had either been to Mayo's Clinic or was planning to go there for treatment; that his mother had always been opposed to the marriage and did not think well of the defendant. This fact was well known to both plaintiff and defendant. He knew that she would not be welcome in his mother's home, and testified that he thought such a visit would cause further friction and embarrassment and might make his mother's condition worse. Such a delicate situation required patience, tolerance and sympathetic understanding by the defendant. It would be difficult for a court to define a proper course of conduct under such circumstances. The plaintiff testified that at that time he was confused, bewildered and greatly worried. He thereafter wrote his wife affectionate letters and apologized for things he had said and done.
However, his failure to go for defendant and take her to Norfolk with him about August 3, as he had promised, is not so easily condoned. His explanation for the disregard of his promise and duty is that he was furious at his wife because of what he had learned of her conduct at the Officers' Club at Great Lakes and of her traveling from Waukegan to Russellville with a married man. It is unnecessary to decide whether his suspicions were well founded, although her subsequent conduct would lend support to his fears. The evidence furnishes a sound basis for his suspicions and he should not be wholly condemned for such an indifferent attitude. A spouse can be guilty of acts which justify an outburst of ill-considered conduct by the other. Culp v. Culp, Mo.App., 164 S.W.2d 623, 626; Ashburn v. Ashburn, 101 Mo.App. 365, 74 S.W. 394.
After the parties returned to Norfolk the first part of September they met and had a long talk about their trouble and spent the night together. Shortly thereafter plaintiff made the allotment referred to above. But evidently their differences had not been reconciled and their confidences restored, because shortly thereafter plaintiff employed the detective agency and the acts of defendant's misconduct occurred, as above described.
It is true that the parties, after another long conversation, spent the night of November 15 together, but it is quite evident that there was no complete reconciliation and forgiveness or sincere and well-founded intention to mend their ways because, within three or four days thereafter, plaintiff telephoned defendant that he wanted a divorce, that he had a girl friend, and defendant resumed her association with other men. The briefs concede *838 that, under the facts, there was no condonation as contemplated by the law. Condonation is not an absolute, but only a conditional, forgivenesss, and if there is a breach of the condition inherent in the condonation, all original grievances are revived. Rusche v. Rusche, supra; Ratcliff v. Ratcliff, 221 Mo.App. 944, 288 S.W. 794; Taylor v. Taylor, Mo.App., 224 S.W.2d 412; Chamberlain v. Chamberlain, Mo.App., 230 S.W.2d 184.
When all the facts and surrounding circumstances are considered, we are unwilling to say that plaintiff's failure to take defendant to Norfolk in August, and his petulant statement in November that he had a girl friend, are sufficient to deny him the right to a divorce. It has been said, "Indignities, such as to warrant the granting of a divorce, (or the denial thereof) ordinarily must amount to a continuous course of conduct. A single act, or occasional acts, will not suffice. The course of conduct must be such as to connote settled hate and a plain manifestation of alienation and estrangement." Haushalter v. Haushalter, Mo.App., 197 S.W.2d 703, 708. Plaintiff's vacilating and unstable acts hardly meet that standard.
We have read and considered most of the fifty citations contained in the briefs and all of those cases announce well recognized general principles of law, but we need not undertake the task of distinguishing them. The over-all general principle controlling in divorce cases is stated by the Supreme Court in Whitwell v. Whitwell, 318 Mo. 476, 481, 300 S.W. 455, 456, wherein it is said: "It is impossible to lay down any rules that will apply to all cases, in determining what indignities are grounds of divorce, because they render the condition of the injured party intolerable. * * * The Legislature chose to leave the subject at large, and by the general words employed, evidently designed to leave each case to be determined according to its own peculiar circumstances. * * * For an indignity to be intolerable in the statutory sense it must amount to a species of mental cruelty."
Defendant also contends that the court erred in excluding Exhibits 4 to 18, which were letters written by plaintiff to defendant prior to the marriage. She cites no authority in support of this contention, and we doubt the competency of such proffered exhibits. We have taken the time to read the letters, which are in the transcript, and agree with the trial court that they essentially show nothing more than what was brought out on cross-examination. The plaintiff freely testified that he had loved the defendant; that he expressed real affection for her; admitted his proposal for a secret marriage; time and again testified that his mother and aunt were opposed to his marriage to the defendant; and that the unkind things he had said and done to his wife were said and done in times of weakness, confusion and bewilderment. We think the letters add nothing material to plaintiff's oral admissions. This much can be said: they did forewarn defendant of the pitfalls which would follow the marriage. It was not prejudicial error to exclude the exhibits.
It is our conclusion that the trial court reached the right result. The decree should be affirmed. It is so ordered.
All concur.