Edna Lucille WHITE (Plaintiff), Respondent,

v.

Clinton WHITE (Defendant), Appellant.

No. 29408.

St. Louis Court of Appeals.

Missouri.

May 15, 1956.

Kenneth F. Summers and Harry R. Stocker, St. Louis, for appellant.

Charles E. Wells, St. Louis, for respondent.

MATTHES, Judge.

In this divorce action the trial court, after consideration of the evidence, dismissed plaintiff's petition and defendant's cross bill. Defendant has appealed. Obviously his complaint is focused on the action of the trial court in dismissing his cross bill and denying him a divorce.

The parties were married on September 2, 1951. On May 23, 1951, plaintiff was divorced from a former husband. To that marriage one child was born, whose custody was placed in plaintiff. This was defendant's third marriage. Prior to the marriage of the parties, and on March 7, 1951, pursuant to an agreement by defendant to purchase a certain parcel of real estate in St. Louis, Missouri, a warranty deed was executed whereby the property was conveyed to Clinton White and Edna L. White, his wife.

It is difficult to determine when the final separation took place. Plaintiff said it was in June, 1954, whereas defendant testified it was on August 4th or 5th of that year. The petition for divorce was filed February 12, 1954, and therein plaintiff alleged the parties separated on January 10, 1954. We have determined that these discrepancies, which we are unable to reconcile, are of no particular significance in the determination of the question here presented.

Although plaintiff has not appealed we set out the substance of her testimony as it has a bearing on the vital question of whether defendant was the innocent party. Defendant constantly accused her of marrying him for his money; he told plaintiff he didn't want her and asked her to get out; the parties would quarrel until 2:00 or 3:00 o'clock in the morning; defendant refused to sleep with plaintiff all the time, and if they slept together defendant would get up and argue, "he would start arguing and say I was crazy and possessed by the devil". Defendant put plaintiff out of the house "four, five or six times". When plaintiff tried to get in her home, defendant refused to open the door. Defendant struck plaintiff once or twice. On one occasion defendant broke all of the light bulbs in their home. After plaintiff became pregnant, defendant said he wasn't the father of the child, and told plaintiff he "wished I would die". When the child was thirteen days old, defendant argued with plaintiff and threw the telephone at her. Plaintiff was forced to leave their home and baby and go to her mother's home because of defendant's treatment. The child had become ill from orange juice which plaintiff had given the baby. Defendant took the child to the Homer G. Phillips Hospital. The next day plaintiff called at the hospital for her baby.

Plaintiff was emphatic in stating defendant knew prior to marrying plaintiff that she had been married before, in fact, she said defendant gave her the money to procure the divorce. He also had full knowledge that plaintiff was the mother of a child by a former marriage. Plaintiff was positive that she took care of her household duties, did not stay away from home at nights except when she was locked out by the defendant, and did not drink intoxicating liquors or indulge in the use of profanity. Mrs. Earlene Williams, a teacher in the public schools of St. Louis, testified that about a week prior to the birth of the child she stopped at the home of the parties. Describing defendant's conduct, this witness stated:

"He was quite angry, nobody knew why. He started ranting what he would do, and he even threatened to hit her. He raised his hand and another girl-friend stepped in between them."

Defendant told this witness plaintiff thought she was going to get something from him, "but he would see her in hell before she got anything".

There was a prior separation in 1952. Defendant testified there was a reconciliation on condition that plaintiff "sign over everything to me, in my hands". At that

time defendant owned two pieces of property in St. Louis. On October 8, 1952, approximately the date the reconciliation was effected, plaintiff and defendant executed a deed conveying the property which had been deeded to them as husband and wife on March 7, 1951, to a disinterested third party, who in turn conveyed it to defendant. Title to both properties was in defendant at the time of the trial.

Defendant testified that he was ignorant of plaintiff's prior marriage, and that she was the mother of a child born of that marriage, until the night of the wedding. He also stated that plaintiff would stay away from home "all night long", this began three weeks after the marriage; that when defendant would come home from work plaintiff was "fixing to go out on the streets"; that plaintiff told defendant, "I was a sucker for marrying her." Respecting the charge that plaintiff associated with other men, defendant's chief complaint centered on May 10, 1954, when, on returning home from work, he found a man whom he knew to be an insurance agent in the bedroom. Another time he saw plaintiff in a car with a strange man. Additional testimony of the defendant was to the effect that plaintiff was extravagant and incurred debts on charge accounts without his knowledge; she was extremely quarrelsome and abusive; that "many times" plaintiff told defendant she did not love him; that she drank intoxicating liquors to excess; that the night the baby was ill (referring to the time the child was thirteen days old), he called the police, and eventually took the baby to the hospital; plaintiff failed to keep the house and baby clean. Under cross-examination defendant admitted he locked his wife out of the home on two occasions, but denied he caused her to leave either time. He gave the detective permission to install a tape recorder in his home; denied paying for plaintiff's first divorce; and insisted he had faithfully and fully discharged his marital obligations.

A private detective employed by defendant on April 27, 1954, testified he kept plaintiff under surveillance until around May 16th of the same year. According to this witness plaintiff was seen at the North Side Bar drinking beer. The next day plaintiff went to the Harlem Night Club in Brooklyn, Illinois, and the detective saw two men talk to plaintiff in the club, but most of the time she was alone. This witness related an episode which occurred in plaintiff's home when defendant was present. He stated: "Mr. White and her got into it. That was between the two of them, a family quarrel." The quarrel became heated. Plaintiff asked the detective to leave, defendant insisted he remain. According to the witness the argument developed into an affray, during the course of which, and in the presence of defendant and a photographer employed by the detective to take pictures of the interior of the home, plaintiff "propositioned" the detective to have intercourse with her. This witness admitted that he attempted to install "an intercommunication system" in plaintiff's home with the permission of defendant, but without plaintiff's knowledge or consent. On cross-examination the witness was asked, "In all your investigation did you see her do anything whatsoever out of the way". His answer was, "No, sir; just the mere fact I trailed her." He "wouldn't come out and say" that plaintiff had loose morals.

Other witnesses appeared on behalf of defendant, but we deem it unnecessary to elaborate on their testimony. Suffice to say that such testimony, if it established any fact, went to the misconduct on the part of the plaintiff.

█ In a divorce case we are duty bound to review the whole record and reach our own conclusions, and it is our ultimate responsibility to direct the entry of such judgment as in our opinion is justly warranted by the evidence. Where, however, as here, there are irreconcilable conflicts in the testimony, and the decision rests largely upon the credibility of witnesses, we must give due deference to the trial judge who saw and heard all of the witnesses. Eikermann v. Eikermann,

Mo.App., 283 S.W.2d 391; Cadenhead v. Cadenhead, Mo.App., 265 S.W.2d 426; Luckett v. Luckett, Mo.App., 263 S.W.2d 41.

 It ·is just as fundamental that relief afforded by divorce is reserved for the innocent who have been injured, and that neither spouse is innocent where both are clearly guilty of indignities towards each other. Pipkin v. Pipkin, Mo.App., 255 S.W. 2d 66; Holmes v. Holmes, Mo.App., 251 S.W.2d 390. In the Pipkin case, supra, this court said, loc. cit. 68 of 255 S.W.2d: "The term 'innocent party', does not mean that the law demands that a party's conduct is above reproach. Rowland v. Rowland, Mo. App., 227 S.W.2d 478. But, on the contrary, a party to a divorce proceeding will not be denied a decree on the ground that she is not the innocent party unless her conduct was such as to entitle her husband prima facie to a divorce had he been free from blame. Rowland v. Rowland, supra; Garton v. Garton, Mo.App., 246 S.W.2d 832."

In support of defendant's contention that he is entitled to a divorce, several arguments are advanced, all of which deal with alleged misconduct on the part of plaintiff. First it is said that plaintiff perpetrated a fraud upon defendant in failing to inform him of her prior marriage and the birth of a child to that union, which knowledge came to the defendant, according to his statement, the night of the wedding. It is also claimed that plaintiff was guilty of indignities entitling defendant to a divorce because of her failure to properly care for their child; her excessive drinking of intoxicants; her association with other men; and her failure to grant his sexual desires except on five occasions.

While these charges found support in the testimony of defendant or his chief witness, the detective, there was testimony to contradict them. This situation calls for the application of the due deference rule. Furthermore there was testimony to establish that defendant was guilty of misconduct which was far from ex-.

emplary, indeed it was sufficient to remove him from the role of the innocent party. That being true, he was properly denied a divorce.

It is evident that the trial court believed that both ·parties were guilty of indignities toward each other, and that neither was the innocent party within the meaning of the law. Careful analysis of the whole record convinces us this decision was proper, and therefore the judgment is affirmed.

RUDDY, Acting P. J., and NOAH WEINSTEIN, Special Judge, concur.