238 S.W.2d 865 (1951)
SCHEER
v.
SCHEER.
No. 28057.
St. Louis Court of Appeals, Missouri.
April 17, 1951.
Suelthaus & Krueger, G. H. Suelthaus and H. John Smith, Jr., St. Louis, for appellant.
Francis M. O'Brien, Louis Gilden and Chas. Thompson, St. Louis, for respondent.
WOLFE, Commissioner.
This is a suit for divorce in which the defendant filed a crossbill for separate maintenance. The trial court granted a decree of divorce to Herman Henry Scheer, the plaintiff, and dismissed the crossbill of Carrie Bessie Scheer, the defendant. From the decree the defendant prosecutes this appeal.
The petition alleged that the defendant had subjected the plaintiff to indignities that rendered his condition as her husband intolerable. In specifying the indignities complained of, it alleged that the defendant improperly associated with other men; absented herself from home until late at night; became quarrelsome and contemptuous of the plaintiff; told him that she no longer loved him; refused to prepare his meals; called him vile names; plotted to kill him; and eventually left and took property belonging to him.
Defendant, in her answer, denied all of the acts she was alleged to have committed in plaintiff's petition, and in her crossbill for separate maintenance alleged that the plaintiff had associated with other women; that he had called her vile names and threatened her life; that he said he would ruin her reputation by false witnesses; *866 that he had sought to have her testify falsely in a criminal charge against him; that he refused to give her money and had transferred his property to avoid paying her money and had taken her automobile.
The parties were married in 1936, at which time Scheer was sixty-four years of age and his wife was forty-seven. They had both been married before. Scheer had two grown daughters by his previous marriage, and Mrs. Scheer had one grown son. Plaintiff and defendant lived in St. Louis County, where they operated a rooming house and occupied living quarters in it. They had apparently lived together without serious difficulty until June, 1944, when, according to plaintiff, he noticed that Mrs. Scheer had become friendly with the male roomers and very cool towards him. Scheer said that after this time his wife was frequently away from home and when he asked her where she had been she said that she had gone to a show or was visiting her daughter-in-law. On one occasion he talked to a person with whom she said she had been visiting and learned she had not been there. His suspicions having been aroused, he talked to two of his friends and asked them to watch Mrs. Scheer and to let him know if they saw her do anything improper.
The plaintiff related that in 1944 they had a roomer named Hildreth, who at times went around the house clad only in his underwear and shorts, and that Mrs. Scheer was very friendly with him. Plaintiff told of an incident he observed in September of 1944, upon returning from a squirrel hunting trip. He said that he had parked his car near the house and upon going into the basement he found Mrs. Scheer, clad only in a dressing gown, embracing Hildreth, who had nothing on but his shorts. When they saw him, Hildreth left at once and plaintiff went upstairs, where he was soon joined by Mrs. Scheer, who asked him what he was going to do about it. He informed her that he was going to do nothing but that Hildreth would have to leave.
One of the men that Scheer had asked to watch his wife was named Young and he was employed in a store near the Scheer home. He testified that one day in September of 1944, while they were closing up the store, he noticed a dark green Ford coupe parked on the store parking lot. He saw Mrs. Scheer in the car with a man and the two were kissing and caressing each other. He noticed the man put something out of the window of the car and later the two left the car and walked away. After this, Young went to the Ford coupe and found a pair of woman's underpants and a glove on the running board. He took both of these to Scheer. They were exhibited in court, and the underwear bore the Scheer laundry mark. Young also testified that he followed Mrs. Scheer and some male companion on two occasions to a tourist camp located in the county and that once they remained in the camp for an hour and a half and the other time they stayed two hours. He testified that on another occasion, when he followed them, they went to a tavern and were still there when he left an hour and a half later. On one of his trips to the tourist camp the witness said that he was accompanied by a young lady, but the young lady later took the stand and denied that she had ever gone with him to the tourist camp.
A witness named Allison also testified that, at the request of Scheer, he watched the tourist camp mentioned and once saw the defendant and a man drive into the tourist camp in a green coupe.
A roomer named Hill, who lived with his wife at the Scheer rooming house, said that he noticed the defendant on several occasions enter the rooms occupied by male roomers. He related that she did this when the roomer was in the room and that the door would be closed while she was there. The witness told of an occasion when he and his wife were sitting, talking to Mr. Scheer, in August of 1944, and Mrs. Scheer entered the room. Mrs. Scheer accused them of talking about her and started to slap and scratch the plaintiff. This incident was also testified to by the plaintiff. Hill further stated that he came upon the defendant and Hildreth on one occasion when they stepped back hastily from a position of close proximity to each other and that *867 Hildreth had a mark of lipstick on his cheek. Hill told of a conversation he overheard at one time when Scheer asked Hildreth not to wash his car at a certain place in the yard, and Hildreth replied that he "stood in better" around there than Scheer did.
A Mrs. Johnson testified that once while she was sitting in a drugstore in a booth next to Mrs. Scheer and a male companion, she overheard a conversation in which Mrs. Scheer said that she would like to "get rid of him". Her companion then handed her a small bottle and said "This will do it". Mrs. Johnson said that Scheer's name had been mentioned in the conversation and that she called him up and told him what she had overheard.
The plaintiff testified that upon receiving a phone call, he looked in his wife's purse and found a bottle marked "strychnine", and that when he confronted the defendant with it she said that she had bought it to kill some rats.
A Mrs. Tucker, whose daughter was married to Mrs. Scheer's son, testified that after the defendant left the plaintiff she moved to her son's home, and that Hildreth called on her there. She also testified that Mrs. Scheer brought to her son's home sheets and pillow slips that she had taken from the rooming house.
The defendant denied that she had ever associated with any men other than her husband, and stated that she had never been to the tourist camp mentioned. She also denied that she ever entered the rooms of the male roomers for any purpose other than to clean. She said she had never been in a parked car on the store parking lot and had never kissed Hildreth. She also denied that she had ever been in possession of any poison.
Defendant testified that the plaintiff had been arrested for the wrongful sale of gasoline rationing coupons in the spring of 1944, and that he wanted her to take the blame for the offense. When she refused to do this, he became abusive toward her and struck her on several occasions. She said that he had become attentive to the women roomers in their place, and one woman who had roomed there testified that Scheer came into her room several times without knocking, and that he told offensive stories. This was denied by the plaintiff in rebuttal.
There was evidence that Scheer had transferred real estate that he owned to straw parties and an earlier suit had been brought to set aside the transfers and impress the real estate with Mrs. Scheer's dower interest. Mrs. Scheer stated that an automobile had been given to her by her husband and that after she left he fraudulently had the title issued to himself. Defendant later found the car unattended and took possession of it to sell it subsequently to her son.
There was evidence that once in 1939 in Hannibal, Missouri, while the Scheers were dining at the home of a Mrs. Freday, Scheer wanted to leave and because his wife did not leave at once he "began to kick the chair and cussed and banged the chair around; and then they had a little argument". An aunt of the defendant stated that the plaintiff refused to pay Mrs. Scheer's lodge dues.
Hildreth was not present at the trial but his deposition was offered and in it he stated that he resided at the Scheer house and was the owner of a green coupe at the time. He stated that he had never kissed nor had he been kissed by Mrs. Scheer, and that he had never gone out with her on any occasion. He had never bought or given her poison of any kind. He had met Mrs. Scheer's son only once. The witness also said that Scheer had boasted to him of his associations with women while, on the contrary, Mrs. Scheer was ladylike in all of her conduct during his sojourn as a roomer with them.
There was also evidence that the grocery clerk was not employed at the store during the month that he said he saw the episode on the parking lot.
This constitutes the essential evidence, and upon it the court decreed that the plaintiff be divorced and that the defendant's crossbill be dismissed, and the appellant contends that the decree of the court is not supported by the evidence.
*868 Her first complaint is that Scheer has not shown himself to be the innocent party. We stated in Rowland v. Rowland, Mo.App., 227 S.W.2d 478, 479, loc. cit. 484, when discussing the same contention: "This does not mean that his conduct towards and his treatment of defendant need on all occasions have been letter-perfect and above all reproach, for if this were so, few divorces, if any, could ever be granted. Stevens v. Stevens, Mo.App., 158 S.W.2d 238; Jones v. Jones, 208 Mo.App. 632, 235 S.W. 481. On the contrary, the conduct of one party will not prevent him from being adjudged an innocent party unless his conduct was such as to entitle the other party prima facie to a divorce. Stevens v. Stevens, supra; Tebbe v. Tebbe, 223 Mo.App. 1106, 21 S.W.2d 915. It must be shown that he was guilty of a continuous course of conduct connoting settled hate and a manifestation of alienation and estrangement, and proof of mere occasional acts or words will not suffice. Hoffman v. Hoffman, Mo.App., 224 S.W.2d 554. Nor is a party to be denied a divorce to which the evidence shows that he is otherwise entitled if his occasional outbursts and lack of complete control over his own actions are plainly induced by the wrongful conduct of the other party. Kolaks v. Kolaks, Mo.App., 75 S.W.2d 600."
The defendant's evidence relating to the incident when plaintiff was abusive to her because she did not leave a party where they were dining was not denied by plaintiff. He did explain that he wanted to leave the place because of his antipathy for one of the parties present, but if the incident had remained unexplained it does not appear sufficient under Rowland v. Rowland, supra, to deprive him of the status of the innocent party.
The only other point raised is that under all the evidence the decree of the court was for the wrong party. It is, of course, true that we must consider the evidence and reach our own conclusions in divorce cases, but where, as here, the evidence is in almost complete conflict and the determination of the case rests on the credibility of the witnesses, we give great deference to the conclusions reached by the trial judge who heard and saw the witnesses. Pickett v. Pickett, Mo.App., 150 S.W.2d 587; Lambert v. Lambert, Mo.App., 222 S.W.2d 544; Culp v. Culp, Mo.App., 164 S.W.2d 623. An examination of the rather voluminous and sordid record in this case affords no guide to where the truth lies and we have no alternative but to defer to the finding of the trial court and affirm the judgment.
It is therefore the recommendation of the Commissioner that the judgment be affirmed.
PER CURIAM.
The foregoing opinion of WOLFE, C., is adopted as the opinion of the court.
The judgment of the circuit court is accordingly affirmed.
ANDERSON, P. J., and McCULLEN and BENNICK, JJ., concur.