Frank **PAXTON**, Jr., Respondent,

v.

Josephine **PAXTON**, Appellant.

Nos. 22818 and 22861.

Kansas City Court of Appeals.

Missouri.

Dec. 1, 1958.

John B. Ewing, Jr., Kansas City, Brenner, Van Valkenburgh & Wimmell, Kansas City, for appellant.

Albert Thomson, Harold T. VanDyke, Kansas City, Davis, Thomson, VanDyke & Fairchild, Kansas City, of counsel, for respondent.

MAUGHMER, Commissioner.

This is a divorce case. Many of the fields of conflict and controversy, including requested remedies and relief, always existing in domestic disputes, but which are oftentimes safely secluded out of court, were here brought into the active arena and fought for in the forums of both the trial and the appellate courts.

On April 23, 1957, plaintiff—husband and father—filed his petition for absolute divorce. He charged gross indignities and adultery. Defendant—wife and mother—countered with a general denial, cross-charged indignities on his part and prayed for a decree of separate maintenance. Each sought full custody of the four children. The trial court found the issues for the husband and against the wife. It decreed absolute divorce to the plaintiff and awarded him full custody of the four

children with the mother having "reasonable right of visitation" and custody from 9:00 a. m. to 9:00 p. m. each Sunday.

 In this state an action for divorce is a statutory suit at law, yet it does, nevertheless, partake in the nature of a suit in equity and is triable as such by the circuit court and de novo as such on appeal, Clark v. Clark, Mo.App., 306 S.W.2d 641, loc. cit. 646. It is, therefore, the rule for appellate consideration that the court review the evidence afresh and redetermine the ultimate issues in the light of that examination as it sees and understands those issues, but always according deference to the honorable trial judge as to the weight of the evidence and especially as to credibility of the witnesses. We do this not because keener insight or superior wisdom is assumed to rest in the brain and bosom of the trial chancellor, but rather because that judge saw and heard and observed the witnesses, while we must depend upon the less revealing written record of their testimony. That such rule is the law is, we think, so generally understood and has in so many opinions had a compilation of cases cited in its support as to not require its being done again in this opinion, which will from other requirements be necessarily rather long.

On this appeal defendant presents two assignments of error: First, that it was error to grant the divorce to plaintiff because the evidence shows that he is not, as a matter of law, an injured and innocent party and, Second, that the court erred in awarding custody of the four children to plaintiff because such is not to the best interest and welfare of the children. Although these assignments number only two, determination thereof involves complete examination of the 908 page transcript filed in this case.

On the first point defendant, although denying her guilt, does not assign as error the finding of the trial court that she was guilty of such wrongdoing as entitled plaintiff to a divorce. It is rather her position that plaintiff's conduct and behavior

was such as to bar any justifiable conclusion that he is the injured and innocent party and, therefore, he is not entitled to a decree of divorce, Section 452.010, V.A.M.S.

Both parties had been reared in Kansas City and were there married on April 15, 1942, and while Mr. Paxton was in active military service. Previously Mr. Paxton had attended the University of Washington for a period and V.M.I. for one year. Mrs. Paxton had been a student at The Barstow School for Girls, at Randolph-Macon Women's College, Lynchburg, Virginia, and at the University of Kansas City. She has a B.S. degree in education. For three months immediately following their marriage, this couple resided in Brownwood, Texas. Then came a transfer to Fort Benning, Georgia, where they lived for one and a half years, and where, on July 15, 1943, their first child, Rebecca, was born. Mrs. Paxton says her husband expressed his belief that their home and finances at that time were not adequate for rearing a family, and that they should wait until later. Mrs. Paxton was ill, run down and thin after this first childbirth. She says her husband would not help with the child care, was away from home much of the time and displayed a violent temper if the baby cried, if the meals were not ready exactly on time, or if the household money ran out too quickly. Lt. Paxton was then ordered to Louisiana. His wife remained for some weeks in Kansas City, and then joined her husband in Louisiana where, because of housing shortage, they occupied a "one room shack". The next stop was Camp Pickett, Virginia, and here Mrs. Paxton attended school for three months. This enabled her to complete the requirements for her bachelor's degree. While in Virginia, the family had part-time maid service and Mrs. Paxton's mother came for an extended stay. Then the family moved to Fort Knox, Kentucky, where the wife became pregnant for the second time. She testified that her husband's indifference and neglect continued, that he refused to help her around the house, or with the child,

and always refused to carry the baby, saying it was undignified for an officer to do so. Their final military location was Carmel, California, near Fort Ord. It was here, according to Mrs. Paxton's testimony, that her husband first began to tell her about his associations with other women of various types. In California it was girls, whom he and other officers picked up in bars and took to hotel rooms. Her testimony covering the period from this time on until their separation in April, 1957, contained reports of similar incidents which she says her husband told her about. There was an office girl and "semi-pro" girls in Las Vegas, lots of girls in New Orleans, girls in a questionable place in Havana, Cuba, and one woman in Kansas City, who was identified by name. Mr. Paxton denied any improper conduct on these occasions and the charges were not substantiated by any other witnesses. During the latter part of his military service, Mrs. Paxton said that in addition to neglect and indifference, her husband became abusive—cursed her and upon occasions struck her—but during all of this period and even during the later years she said that she loved her husband, while Mr. Paxton on his part asserted that until the last year or so, his wife was "a good wife".

Next came the transposition from military to civilian life. Plaintiff's father was owner of the Frank Paxton Lumber Company of Kansas City, which owns and operates lumber yards in Kansas City, Chicago, Fort Worth, Denver, Albuquerque and Des Moines. The plaintiff, Frank Paxton, Jr., upon his separation from the armed forces became associated with this enterprise and his first assignment was at Des Moines. As the beginning, his salary was about $300 monthly, but was quickly increased to $500. After a brief apprenticeship in Des Moines, plaintiff went to Chicago as a company representative. In 1951, Mr. Frank Paxton, Sr., died and plaintiff was named president of the company. His salary at the time of the trial was $35,000 per year. He owned some 31,000 shares of

stock on which, in 1956, annual dividends in excess of $13,000 were paid. In addition, the company paid not only his traveling expenses and some club memberships and dues, but on one occasion bought him a Cadillac convertible.

Mrs. Paxton testified that her husband's neglect, indifference and abuse continued while the family was domiciled in Des Moines, Chicago and in Kansas City. During all of their married life the husband has been absent from home much of the time and Las Vegas was one of his frequent ports of call. He says these absences were business trips, necessary to the supervision of the company's lumber yards, and that for an extended period when the company was being reorganized in 1951, he worked late—after midnight—in the local offices. Defendant questions if any man works day and night, regularly, and points out that no company lumber yard is located at Las Vegas.

Soon after the parties moved to Hinsdale, Illinois, in the Chicago area, the husband returned from one of his trips late at night and found his wife and two children absent. He said he carefully searched the house, looking for a note or indication as to where they might have gone. He found a box of letters from one Mr. Eib, a Des Moines resident and a mutual friend of the Paxtons, indicating that an intimate relationship existed between his wife and Mr. Eib. His wife and children returned the next day. They had been in Des Moines, and he questioned her about the whole matter. Mrs. Paxton told him she wanted to talk with Eib and two days later told him that it had been a mistake, that she was sorry and wanted to be a good wife. He said he forgave her and they resumed their marital life. This incident was neither denied nor disputed.

We now come to the last few years of this couple's married life. In the meantime two more children had been born, making a total of four, namely, Rebecca, now age 15 years; Marjorie, 13 years; Frank, III, 8 years, and James, age 5 years. Mr. Paxton continued to be away from home on fre-

quent and extended trips. Early in 1955, he came home from Albuquerque one night after midnight. His wife was not at home. She arrived about 3:00 a. m., driving up in her car ahead of a white station wagon in which there was a man who waved good night to her and drove off. She told her husband that this man was a close friend, that it was an innocent affair and assured him that "it is perfectly all right", but refused to state the name of this person. On Sunday, July 1, 1956, Mr. Paxton was in the State of Oregon. He called his wife by long distance telephone about 6:00 a. m. She was not at home. In the fall of 1956, plaintiff testified he frequently came home after midnight, found his wife absent and said she did not return until late, sometimes as late as 2:00 a. m. Her explanation was that she had attended art school and then "gone out with the girls". He said she was frequently not at home at dinner time. On February 28, 1957, he saw her car parked near the Jubilee Room, a bar in Kansas City. He went in and found her drinking martinis with a Mr. Dale Piper, who will be referred to frequently later in this opinion. About this same time a lumbermen's supplier was being entertained by the Paxtons. They had dinner at Putsch's and then went to the Golden Horseshoe for drinks. Dale Piper was there and Mrs. Paxton brought him over to their table, where he remained until the party broke up. Mr. Paxton said he continued to call home after midnight and frequently found his wife gone. He said she gave various explanations. On March 1, 1957, he went to San Francisco to attend a Western Pine Association convention. That night he placed a telephone call for his wife about 1:00 a. m., Kansas City time. She was not at home. He repeated the call the following night about 3:00 a. m., Kansas City time, with the same result. He testified that he called for six successive nights before he was able to contact her on the residence 'phone. Mr. Paxton stated that he told his wife that the Piper association was no good; that she responded that nothing was wrong; that he

was being melodramatic, ought to be in Menninger's clinic, and suggested that he use a detective to check on her if he was suspicious.

Mrs. Cleta Mae McCormack, who with her husband manages the Baltimore Arms Apartments, 3521 Baltimore, Kansas City, testified as follows: That on March 15, 1957, Mr. Dale Piper was the tenant in Apartment No. 411; that she saw Mrs. Paxton there many times, saw her enter Apartment 411, heard her make 'phone calls from that apartment, and that on occasion she borrowed the sweeper and took it into Apartment 411. Mr. McCormack said he saw Mrs. Paxton and Dale Piper come into the apartment building through the back door and go on up on the elevator.

In March, 1957, the plaintiff, through his attorneys, employed Mr. George Robinson of Kansas City, head of an investigative agency, to make an investigation of Mrs. Paxton's activities. Mr. Robinson, his wife Virginia and his operators, Alfred Perrenoud, Nadyne Cantrell and Orville Adams worked on the investigation, commencing April 1, 1957, when they first placed Mrs. Paxton under surveillance. We now summarize the evidence of these detectives: On April 1, 1957, defendant drove her car to 36th and Main, parked in an alley, walked to the Baltimore Arms Apartments, entered by the back door and had not left the apartment building at 4:30 a. m. the following morning when surveillance was discontinued. At 7:40 a. m. April 2, 1957, surveillance was resumed and her car was still parked in the same place. At 10:15 a. m. she came out of the building, entered her car and returned to her home. On April 3, 1957, at 6:00 p. m. her car was parked in front of the Jubilee Room, 3526 Main, Kansas City, Missouri. She entered and left an office building (where Dale Piper maintained an office) near there several times until at 8:20 p. m. Dale Piper drove up. Mrs. Paxton and Piper embraced and kissed on the street. Her car was parked near the Baltimore Arms Apartment from 8:00 p. m. on April 4, 1957, until 12:05 a. m. April 5.

Her car was parked at the same place from 4:00 p. m. April 5, 1957 until 4:00 a. m. the next day when surveillance was discontinued.

On Monday morning, April 8, 1957, the detectives rented Apartment 410, Baltimore Arms, which apartment adjoined Apartment 411, occupied by Dale Piper, and by 1:00 p. m. had electric monitoring equipment installed and monitoring in both apartments. Shortly after 9:30 p. m. Mrs. Paxton and Dale Piper entered Apartment 411. Over the monitoring system the clatter of china and the noises of a vacuum cleaner in operation could be heard. This recording and monitoring device was described as of the tape recorder type—Ekotape—with a microphone installed in Apartment 411, a few feet from the floor and behind a heat register to conceal it. From it a coaxial type cable ran into an amplifier stationed in Apartment 410. There was also a tape and recording machine which recorded conversation and noises. The operators heard low murmured conversation and occasional laughter. At about 1:00 a. m. quiet descended upon the apartment, the lights went out and nothing more was heard until 7:30 a. m. April 9, when again male and female voices were heard. At 8:30 a. m., Mrs. Paxton and Dale Piper left Apartment 411 together. On April 13, Robinson and one of his operators entered Apartment 410, set up their recording equipment and began monitoring Apartment 411. About 3:00 p. m. they saw Mrs. Paxton enter Apartment 411 alone. About 3:30 p. m. Dale Piper entered. Both left about 4:30 p. m., but at 11:30 p. m. both returned and again entered Apartment 411. The detectives heard no noises from that time on until about 9:00 a. m. the following morning. Commencing at 10:00 a. m. recordings of conversations were made. There was nothing of deep significance in the fragments of conversation heard. On Sunday, April 14, at 5:00 p. m. these people again entered Apartment 411. Dale Piper and Mrs. Paxton left together with a bundle of laundry. A motion picture film of their departure was

made and shown in evidence. At 1:05 a. m. on April 16, Piper and Mrs. Paxton again entered Apartment 411. Mrs. Paxton left at 9:30 a. m. the following morning.

These investigators did not shadow Mrs. Paxton again until October 24, 1957. This was after April 23, 1957, when the suit for divorce was filed, but this evidence is pertinent—certainly on the child custody question—which will be considered at length in the final chapter of this opinion. On Monday, October 28, 1957, Mrs. Paxton and Dale Piper, about 5:00 p. m. drove to the Green Crest Motel, 15014 East No. 40 Highway. Piper entered the office, remained a few moments, came out and with Mrs. Paxton entered Cabin No. 48, at 6:30 p. m. They both came out at 7:40 p. m. She met Piper at 6:00 p. m. on October 29, at a 601 Linwood parking lot. They left in her car but the operators lost them in traffic. On Monday, November 4, the parties, traveling in Piper's truck, again went to the Green Crest Motel and entered Cabin No. 24 at 9:05 p. m. They left at 11:50 p. m. All of this surveillance narrative is, of course, taken from the testimony of Robinson and his operators.

The deposition of one Hans Schmidt was read as evidence. He is a real estate salesman. In the winter of 1955, he said some friends of his were going to a dance at the Country Club and asked him to escort Mrs. Paxton, whose husband at the time was out of town. He did so. He saw her approximately three times each month from then until November, 1956. He said she came to his office and wanted him to show her houses that were for sale, and he did so; that they frequently had lunch and dinner together and that she occasionally came to his house. He testified that on these occasions she stayed from 15 minutes to an hour and that sometimes she was there when he was alone.

Mrs. Paxton bought men's clothing, including a topcoat, which were charged to her husband, and which he claimed he never received. Mrs. Paxton said the topcoat was

given to her father. Photostats of a few canceled checks—one for $150 and one for over $200—were received in evidence. These checks were signed by Mrs. Paxton and endorsed "Dale Piper." On March 24, 1957, plaintiff arrived home about noon from Albuquerque. Mrs. Paxton was not there. He found her car parked on the north side of the Baltimore Arms Apartments.

Mrs. Paxton described an occasion when she said her husband tried to run her down with his automobile. She was in her car and he was in his at the time. His version was that he was just trying to keep her from leaving home in her car. He was not successful in preventing her departure. While they were in Havana, they attended a nude and questionable girls' show in a room that was equipped with mirrors on all the walls and ceiling. She said he forced her to go. He stated it was one of the tourist attractions and that they made the trip by mutual agreement.

After receiving the detectives' report plaintiff visited his wife's parents. His testimony was that he appealed to them to "help us", told them if his wife, their daughter, would confess that he would forgive her. Her father asked her to come to his house and talk it over. She refused, saying that Frank had been drinking and that it would do no good. According to plaintiff's parents-in-law, Mr. Paxton told them in this conversation that he would "fix her", "kick her out in the street" and "take her children away from her".

■■ We believe that this summation of the evidence constitutes a fair and sufficiently complete synopsis except that some additional evidence will have to be considered on the issue of child custody. After having considered this record, and we have carefully read the entire transcript, we have reached the conclusion that plaintiff's allegations, or most of them, were proved, and that Mrs. Paxton has been guilty of such gross indignities and such marital misbehavior as to constitute ample grounds for

divorce. The divorce decree for plaintiff will, therefore, be affirmed unless defendant's contention that plaintiff, too, was guilty of such misbehavior as to preclude the finding—always a requisite in a divorce case—that he was in law the injured and innocent party.

■ If defendant's assignment of error on the ground that plaintiff is not the innocent and injured party is to be sustained it will have to be bottomed on a finding that he was guilty of such indignities as would, standing alone, have entitled the other party to a divorce. In Scheer v. Scheer, Mo.App., 238 S.W.2d 865, it was held that to require a denial of the divorce to the injured husband on the ground that he was not the innocent party, it was necessary to show that he was guilty of a continuous course of conduct connoting settled hate and a manifestation of alienation and estrangement, and proof of mere occasional acts or words would not suffice. In Cadenhead v. Cadenhead, Mo.App., 265 S.W.2d 426, the husband was charged with slapping his wife on occasions, excessively punishing a child, and general neglect. In that case he was held to be the injured and innocent party and on page 435 of the opinion this court used the following language in setting forth the rule: "While each divorce action based on alleged general indignities must be determined on its own facts, the courts have said repeatedly that indignities, such as to warrant the granting of a divorce, ordinarily must amount to a continuous course of conduct. A single act, or occasional acts, will not suffice. The acts relied upon must amount to a species of mental cruelty, and must evidence a course of conduct by one of the parties toward the other whereby the other's condition is rendered intolerable through acts of such character and frequency as to be subversive of the family relation. Clemens v. Clemens, Mo.Sup., 235 S.W.2d 342, 346; Hoffman v. Hoffman, Mo.App., 224 S.W.2d 554, 561; Key v. Key, Mo.App., 93 S.W.2d 256, 259".

To the same effect is the recent interpretation given this question by the St. Louis

Court of Appeals in Elgin v. Elgin, Mo. App., 301 S.W.2d 869, loc. cit. 872: "A party to a divorce action is not deprived of his status as an innocent party simply because his conduct has not been perfect at all times. Before one is prevented from being adjudged the innocent party his or her conduct must have been such as to entitle the other spouse to a divorce".

We find the following statement in the opinion in Rowland v. Rowland, Mo.App., 227 S.W.2d 478, loc. cit. 484: "It must be shown that he was guilty of a continuous course of conduct connoting settled hate and a manifestation of alienation and estrangement, and proof of mere occasional acts or words will not suffice. Hoffman v. Hoffman, Mo.App., 224 S.W.2d 554".

Our Supreme Court in Simon v. Simon, Mo., 248 S.W.2d 560, announced the same rule on page 563 of its opinion and with this language: "An 'innocent' party is not required to conclusively prove freedom from all fault, or such exemplary conduct as excludes any misconduct or all unwise or uncalled-for acts. He or she need show only that, under all the circumstances of a particular case, he or she has not been guilty of conduct constituting a ground or grounds for divorce under RSMo 452.010, V.A.M.S. Cody v. Cody, [Mo.App.] supra, 233 S.W.2d [777] 782(6,7); Politte v. Politte, Mo.App., 230 S.W.2d 142, 148(4). Plaintiff sustained her burden of proof in the instant case".

Defendant has cited and we have read numerous cases wherein on appeal it was held the prevailing party below was not the innocent and injured party. All these cases involved serious indignities, and the proof was quite preponderant. Here the indignities charged against plaintiff included family neglect, recitations by him of associations with other women, abusive language directed toward Mrs. Paxton and the children, and occasionally striking defendant. Proof thereof rested almost completely on the testimony of defendant, and the charges were either denied or explained by plaintiff. The trial court, although not entering a specific finding on this particular question, necessarily, by its decree, found thereon for the plaintiff. It seems possible that some of plaintiff's explanations—for example that one woman came to his hotel room to "brush her hair"—might have strained the credulity of the trial judge. Certainly as we have read and studied this record, we have been unable to visualize plaintiff in a white robe, and have listened in vain to hear the rustle of a wing. However, as previously pointed out, an appellate court usually defers to the finding of the trial judge, especially as to credibility of witnesses. Moreover, this marital ship has run hard aground on reefs and rocks. Probably the time has come for both crew and passengers to abandon ship and go ashore. We are unable and unwilling to hold that the trial court erred on this question and we, therefore, rule defendant's first assignment against her, holding that in this case the plaintiff is entitled to be considered in law as the innocent and injured party.

We have now reached the third and most difficult decision which we are required to make in this case, namely, a determination as to custody of the children. This question, of course, is not a new one in the courts but in approaching it in this case we shall first examine some of the decisions. We examine these cases first to find authoritative declarations as to the general rule or rules and, second, to freshly observe just how these rules have been applied in various cases, some of which have points of similarity to our case.

To begin with, it may be stated that the appellate court is not bound by the finding of the trial court, but rather has the duty to review the evidence and render such judgment as is proper under the law and the evidence, but not lightly disturbing the finding of the trial judge. Watkins v. Watkins, Mo.App., 230 S.W.2d 778; Libbe v. Libbe, 157 Mo.App. 701, 138 S.W. 685.

Usually in custody matters the choice is restricted to the two parents. Our

courts have announced some general conclusions which, although not unalterable, are exclusively recognized and applied in determining the entitlement of a mother and of a father to the custody of their minor children. We quote briefly from some such cases. In Ballew v. Ballew, Mo.App., 288 S.W.2d 24, loc. cit. 26, this court said: "Courts have said, at various times, that, all things being equal, custody should be granted to the mother, especially as to the very young children, and as to girls. But, always, the court must act in the best interests of the children, thereby sometimes being required to deny custody to either parent". And from the St. Louis Court of Appeals in Bedal v. Bedal, Mo.App., 2 S.W.2d 180, loc. cit. 184: "As to the question of the custody of the children, we have no fault to find with the decree of the court, entrusting them to the care of the mother, but reserving the right to plaintiff to visit them at reasonable times. In determining the claims of parents to the custody of minor children, the personal welfare of the children themselves is always the first consideration to be kept in mind, and is superior to the claims of either parent, whose wishes and personal desires must yield, if opposed to such welfare. (Citing cases.)

"All things being equal, the courts are the more inclined to feel that the proper place for minor children is with the mother, although the rule is by no means an inflexible one. * * * She is able to give her undivided attention to their care, while plaintiff would be forced to leave them with relatives, occasionally for considerable periods of time, when his business affairs would require his presence out of the city. Consequently, from all the facts and circumstances in the case, it would seem that the court ruled wisely when it awarded the custody of the children to defendant, even though the decree had otherwise gone in plaintiff's favor."

Again, from the St. Louis Court of Appeals in McKenzie v. McKenzie, Mo. App., 306 S.W.2d 588, loc. cit. 591, this comment: "It is next contended that the court erred in awarding custody to the mother in that the father prevailed in the divorce case. The fact that either party prevails in a divorce case is not the determining factor in awarding the custody of the children involved. The custody of children should never be awarded as a means of punishing one parent or rewarding the other. The determinative factor in awarding custody is the welfare of the child. Green v. Perr, Mo.App., 238 S.W.2d 924; Ballew v. Ballew, Mo.App., 288 S.W. 2d 24. It is quite naturally considered that very young children and particularly girls should be in the custody of their mother unless she is demonstrably unfit to assume their proper care".

Finally we quote from the opinion of Zerega v. Zerega, Mo.App., 200 S.W. 700, at page 701: "We are satisfied, under the state of the record as it is presented to us, that the learned trial judge was not in error in granting the divorce to the defendant, but we feel that he was clearly in error in awarding the custody of the child to the defendant instead of to the plaintiff.

"The child in this case is a boy now about six years old. The record shows that the mother has been devoted to the child, and that she has at all times given him every care and attention. * * *.

"We feel that under all the facts and circumstances the best interests of this child demand that he be placed in the custody of the mother. Should the facts and circumstances change in the future, the husband will have his opportunity to present them to the circuit court for such determination as the facts as they then appear may require".

Nearly always child custody presents a most serious and trying problem. The writer of this opinion, as a trial judge, found it to be so and he finds it substantially the same as an appellate judge. The parents, both of them in many instances, are in court because of their own transgressions. The children stand in a position somewhat similar to that of innocent by-

standers. The parents are mature and wound less deeply than does the child of tender years, who is usually cut to the quick. The mother and father, divorced, may, and they often do, find a second and a sometimes happier marital home. The child will never have a second natural father or second natural mother, and in numerous instances at least, for so long as the parents live, that child will occupy a sort of "No Man's Land" between them, where it will be buffeted by the recriminations and disturbed by the vicious criticisms which each parent regularly fires as a sort of barrage in the general direction of the other, hoping thereby to influence the child. To a layman or to anyone thinking on this question for the first time, it might seem that as a matter of course the children should be given to that parent ruled to be the injured and innocent party in the divorce case, and that the rights of the guilty party—including even consideration for child custody—should be treated as washed away by that parent's marital misconduct. This reasoning, in effect, would amount to a consideration of the children as a sort of "prize money package" to be awarded to that parent who, by comparison, was least at fault. But if we think more deeply and soundly, the fallacy of such a procedure becomes quickly apparent. Custody of a child is to be given neither as a reward to one parent, nor yet is it to be withheld as a punishment to the other parent. The quotations from the opinions which have been incorporated herein develop the true rule and set forth the proper test, namely, "What is best for the child?" Such is the law and it is the law of wisdom. In groping for the proper answer to this ultimate question there are many elements which must be considered. Do these parents, and in most instances that means the father, possess the wherewithal to provide material necessities and maybe some comforts? Unless both parents are utterly unfit, we must grant custody to one or to the other, and so we look at these two existing alternatives. What kind of home life would the mother provide, and what kind can the father provide and continue to work and earn a living? Will their actual upbringing day by day be entrusted to a housekeeper, a maid, paternal grandparents, or a second wife? If to grandparents, what are their ages and what has been their prior relationship to these children? How old are the children and who has actually week by week reared them during these first years of their lives? Are they too young to be taken away from their mother? Are they old enough to have definite ideas of their own as to where they wish to go? If there is more than one child, should the children be separated or kept together? What kind of care has each parent been providing in the past? Which home will likely least disturb and upset the child or children emotionally and physically? Should we consider part-time or divided custody? These are some of the questions we must ponder in our search for the ultimate conclusion.

The record here contains evidence, direct and indirect, which bears on the issue of child custody. Four former maids or housekeepers testified. Two spoke of Mrs. Paxton's frequent absences from home but mentioned no other instances of child neglect. The other two said the children were well cared for and leveled no criticism at either parent. Three neighbor women said the children were well behaved, well dressed and well cared for. Four teachers from Barstow and Sunset Hill Schools, where the girls had been students, testified that each was well behaved, was a good student and each approved of them in every way. So did three of their Sunday School teachers. Lt. Col. and Mrs. Jerry M. Wimberley, mutual friends of the Paxtons, testified. Mrs. Wimberley was a girlhood friend of Mrs. Paxton, and the Wimberleys had visited and gone out with the Paxtons. They approved of Mrs. Paxton and spoke highly of the appearance and apparent care the children were receiving. It will be remembered that the plaintiff himself described Mrs. Paxton as "a good wife" except for her too frequent absences

from home and her highly objectionable "extra curricular" activities with men. He did not charge her with being deficient or delinquent otherwise as a mother. It was his plan if he secured custody to vest supervision for these periods when he was absent from the home, with his mother and with a housekeeper. His mother, Mrs. Paxton, Sr., is 65 years of age and has, according to the evidence, been with the children only occasionally through the years, such as at Christmas and Thanksgiving. It should be recalled that in addition to normal work day absences, Mr. Paxton's business does require him to be absent on frequent trips for several days at a time.

The depositions of the two oldest children, Rebecca and Marjorie, 15 and 13 years old were read into evidence. Both said their mother took good care of them and looked after their school affairs, clothing, food and health. These girls said that they had been with their paternal grandmother only infrequently, and that their father had never spent much time with them. Each unequivocally and vehemently expressed her definite wish to live with her mother and objected strenuously to living with her grandmother Paxton or with her father. Apparently Mr. Paxton talked with Rebecca about it and when she objected, he told her that he might send her to a boarding school.

We have here two girls, almost grown, and two boys, age 8 and 5 years. Apparently most of their parental care, during their lives has so far come from their mother. Everything in this case, we believe, indicates that the mother should have custody—except only her most improper misbehavior with Dale Piper and possibly, to a lesser extent, with two other men. Do those incidents or does that one extended affair make her unfit now and forever, as a matter of fact, and in the eyes of the law, to continue to live with, associate with, and rear the two teenage daughters and the two young sons whom she conceived and nurtured and whose

mother she is? Without further wrestling and without further written debate on these facts and as to the law applicable, we have reached the conclusion that they do not. We hold, therefore, that the trial court erred in awarding custody of these four minor children to the plaintiff and that the welfare and best interests of said children will be promoted and be best served through an award of custody to the mother. The question of child custody and allowances for their support and maintenance in this case as in every other divorce case is, of course, subject to future modification by the circuit court upon a showing of a change in condition or status.

There is one other feature of this litigation that must be considered. After the trial of the divorce case and on March 15, 1958, the court entered its order and judgment that Frank Paxton, Jr. pay to Josephine Paxton "during the pendency of the appeal" (in the divorce case) (1) the sum of $750 per month for her support and maintenance; (2) the sum of $750 monthly for support and maintenance of the four minor children and (3) make all payments accruing on the family home at 1235 West 61st Terrace, Kansas City, Missouri, under the deed of trust, for taxes, for insurance, and that he pay all private school tuition charges. The order also gave Mr. Paxton part-time custody "provided he complies with the above provisions".

Mr. Paxton appealed from that order and judgment to this court in case numbered 22861. No objection is made as to the amounts of the payments ordered. Two assignments of error are made, viz. First. The order is invalid because the temporary partial custody therein given Mr. Paxton is made contingent upon his timely compliance with the money payment orders and, Second, the order is invalid since the trial court had already in the divorce decree granted permanent custody of the children to Mr. Paxton. For appellate purposes, including the opinion and mandate, it seems advisable and this court has

consolidated this appeal in Case No. 22861 with the main divorce case appeal, No. 22818.

Appellant, Mr. Paxton, in his brief, frankly states that he has found no Missouri case supporting his position as to either assignment of error. Our Missouri courts have approved granting such allowances pending appeal. In Zerega v. Zerega, 200 S.W. 700, loc. cit. 701, the court said: "We are unable to conceive on what just grounds the order of the court overruling that motion could have been based. The wife has a right to prosecute or to defend an action for divorce, and, whether the trial court finds the wife to be the guilty party or not, she should not be deprived of her right to an appeal or to the right to her means to prosecute it during its pendency, and, as our courts have frequently said, since the husband usually holds the purse strings, he must furnish her the means of attack or defense, else she may often be left in a helpless and defenseless condition".

In Burtrum v. Burtrum, Mo.App., 200 S.W.2d 80, loc. cit. 82, this court spoke as follows on the subject: "In Libbe v. Libbe, 166 Mo.App. 240, loc. cit. 246, 148 S.W. 460, we held that, whether guilty or innocent, the wife has a right to prosecute or defend an action for divorce; that the husband must furnish her the means of attack or defense if she is without adequate means of her own; and that she has a right to appeal and to the means of presenting the appeal and of sustaining herself during its pendency".

In Price v. Price, Mo.App., 281 S.W.2d 307, loc. cit. 313, the court used this language: "It has been said pointedly that, whether guilty or innocent, the wife has a right to prosecute or defend an action for divorce and that, if she is without means of her own, the husband should be ordered to pay reasonable allowances for that purpose. (Citing cases), and in similar vein that, unless it clearly appears that her appeal is without merit (Rosenfeld v. Rosenfeld, 63 Mo.App. 411, 412–413(1)), a wife should not be deprived of the right to means for prosecuting an appeal, simply because the court has found her to be the guilty party".

The trial court is vested with broad discretion on matters of custody. We do not believe that under the circumstances here existing the granting of contingent part-time custody to the father, ipso facto, voided the judgment. We find the issues on this second appeal against the appellant-husband and for the respondent.

In accordance with the conclusions herein expressed, the judgment in Case No. 22861 is affirmed. As to Case No. 22818, those parts of the judgment dismissing defendant's cross-petition for separate maintenance and granting plaintiff a decree of absolute divorce on his petition, are affirmed. That part of the judgment and decree awarding custody of the four minor children to plaintiff is reversed. and the cause is remanded with directions to enter a judgment and decree awarding care and custody of the four minor children to defendant, but providing therein that plaintiff may have custody from 9:00 a. m. on the first and third Saturdays of each calendar month until 8:00 p. m. on the ensuing Sundays, and during the calendar month of each July, with the plaintiff in each instance calling for and returning the children to the mother's home. The court is further directed to enter a judgment in favor of defendant and against plaintiff in the sum of $950 as of the first day of the month following receipt of this mandate, and opinion and a like amount as of the first day of each month thereafter until further order, as and for support and maintenance for said minor children.

SPERRY, Commissioner (concurs).

The foregoing opinion by MAUGHMER, C., is adopted as the opinion of the Court.

All concur.