**Patsy Pearl YOUNT, Appellant,**

v.

**Bill G. YOUNT, Respondent.**

No. 23711.

Kansas City Court of Appeals.

Missouri.

April 1, 1963.

Francis L. Roach, Solbert M. Wasserstrom, Kansas City, for appellant.

Martin Anderson, Kansas City, for respondent.

HUNTER, Judge.

This is an appeal from the order of the Circuit Court of Jackson County upon a motion by the divorced husband for a change of child custody from their mother to him. The circuit judge after a hearing on the motion ordered custody of the four children involved changed from the mother to the paternal grandmother, with the mother having visitation privileges each Saturday from 9:00 a. m. to 6:00 p. m.

For review purposes the story commences in June, 1960, when Patsy Pearl Yount, appellant, obtained a divorce from Bill G. Yount, respondent, and she was granted custody of the four children of the marriage, child support in the sum of $40.00 per week, with Mr. Yount granted general visitation privileges. Thereafter, she had custody of these four children, Bill, Jr., now age 11; Pat now age 10; Linda, now age 8; and David, now age 7, until the mentioned trial court's order on May 4, 1962.

The motion to modify the divorce decree, filed March 20, 1962, alleged in substance a change in conditions of the parties consisting of (1) that the children's mother is not capable of administering the wants, needs and welfare of the children; (2) that she associates in an immoral manner with other men in and about the premises where the children reside; and (3) does not keep the home where the children reside and permits the children to go about in a dirty and disheveled manner and does not tend to the health or requirements of the children, all detrimental to their welfare.

The trial was held on April 6, 1962. Bill Yount testified that after the divorce his former wife and the four children continued to occupy the three bedroom house purchased by him and her jointly during their marriage. He continued to visit the house nearly every Sunday to see or pick up the children. The housekeeping was not good and there was never anything in the

icebox except milk and wine or whisky. On Sunday mornings appellant's eyes would be bloodshot and her skin puffy from drinking. Upon some such occasions he saw her drinking wine and beer with the children present. On one Sunday when he picked up the children she introduced him to Mr. Glen Ladd, a married man who had just separated from his wife and who was dating her.

According to respondent, prior to dating Ladd appellant had dated a single army major, visiting with him in his bachelor apartment some four or five nights a week until 1:00 or 2:00 a. m. She would come home in a drunken condition and would drink in front of the children.

Commencing with the divorce in June, 1960, appellant got a job. The children were left alone at the house from school every evening from 4:00 p. m. until she got home from work about 5:30 p. m. or later. They were frequently left alone all night with young baby sitters. Respondent conceded the children were well reared to an extent but were not well dressed. They are all doing quite well in school.

On numerous occasions other than Sundays respondent would call on his ex-wife and attempt to talk to her, sometimes to ask her to remarry him. Almost every time there was an argument. She would call the sheriff or the police to have him put off the premises or to leave her alone. He denied he has ever threatened, struck or beat her since their divorce. He had neighbors keep an eye on her and tell him about her activities. He often personally checked up on her and her dates.

A neighbor, Mrs. Blankenship, at his request kept notes on appellant's activities. Mrs. Blankenship testified she had to get up every morning at 4:30 a. m. to see her husband off to work at 6:00 a. m. and that she had a big picture window facing appellant's house. Appellant occasionally used as baby sitters two brothers, Donald and Darrel Phillips, age 12 and 16. Other young baby sitters were also used. Commencing about February 23, 1962, Mrs. Blankenship observed that Mr. Ladd on approximately a dozen occasions spent the entire night in appellant's home with the four children also present. On other occasions Ladd would stay until the early hours of morning. On a few occasions appellant would be gone all night leaving the four children with some very young baby sitter. The children were not clean and well kept all the time. They were not dressed like other children dress and should have been dressed better. They are good children. Since Christmas, 1961, appellant has employed a woman, Nadine Phillips, to keep the house and the children.

Mrs. Blankenship's husband, Carl, testified he had seen appellant and Mr. Ladd embrace in Ladd's car one night, and kissing and embracing a couple of times in the doorway of her house.

Phyllis Ladd testified she and Mr. Ladd were separated but not divorced. On March 23, 1962, she filed a divorce suit against him. She has seen her husband and Patsy together on numerous occasions smooching and kissing. Once she saw them leaving Ladd's motel room about 1:30 p. m. "He's been with her every night." Three weeks before this hearing she caught Patsy in her husband's office sitting on his lap and kissing him. She also saw them arm in arm in the hall during the trial court hearing.

Donald Phillips testified he saw Mr. Ladd at appellant's house 20 or 25 times while he was baby sitting. Appellant and Mr. Ladd would come home together "usually real early in the morning, about four thirty or five o'clock." They ordinarily arrived just before the kids and he had to leave for school. Appellant would feed the children on these occasions. She kept whisky and beer in the refrigerator and some food. The house would have the children's and her clothes thrown around the various rooms. There would be dirty dishes. Since February 1, 1962, he has sat about

fourteen times for her and has earned as much as $50.00 a week. She usually paid him 50¢ an hour but when she started going with Mr. Ladd she paid him $10.00 a night which figured about $1.00 per hour. When she went out with the major she was always in between twelve and two but with Mr. Ladd she remained out until four thirty, five or six. He never saw appellant abuse, mistreat or talk rough to her children. He has seen her drink milk and whisky in their presence and has seen her kiss Mr. Ladd "in front of the children, and then after they went to bed."

Darrel Phillips testified Mr. Ladd was around appellant's some at night and would also come over and eat breakfast with her. While baby sitting he has observed appellant and Mr. Ladd drinking together and kissing. The children would be in bed. He has observed Mr. Ladd staying all night two or three times. On one such occasion "I slept in her room, and they slept on the divan, I guess, I don't know." Sometimes the kissing would last a half hour. He and his brother would be paid $5.00 apiece for each baby sitting job. Mr. Ladd was providing the money for the baby sitter.

Mrs. Ethel Yount, respondent's mother and the children's paternal grandmother, told of her three bedroom modern home, of her love for the children and the desire of her and her husband to have the custody of the children. She is forty-eight and her husband fifty-one years' old and both are in good health. He is a former assistant scoutmaster, and is employed as a steam fitter. She described the times she has had the children in visits, her care of them, the clothes and other items she has bought them, and gave the opinion that Patsy's baby sitters "were inadequate to care for children every night."

Patsy, now 28 years' old, testified that at the age of 17 she married Bill Yount. She is presently employed as a secretary-bookkeeper by a local construction company at a salary of $90.00 per week. She described in detail how after her divorce in June, 1960, her ex-husband would spy on her and threaten any man whom she dated. She told of several single men she had dated but who in effect had been run off by her ex-husband who on at least twenty occasions hit, slapped and beat her. She had been knocked flat on her back and even had a rib cracked. He has gotten her on the floor and choked her until she was unconscious. He has held a butcher knife against her throat. "If I had a date I knew when I got home I would get the very tar beat out of me." To protect herself from physical harm it was her practice to call the sheriff or the police when her ex-husband came around unless it was for him to get the children for visitation. He continually tried to get her to remarry him but she fears him and does not love him. His last effort to get her to marry him was just three weeks prior to her testimony. He is still going with a married woman "he was going with when we got our divorce, and this married woman has four children."

Appellant testified she met Ladd through her work. She knew he was a married man, that his wife was pregnant and that he was only separated from her. She freely admitted her numerous dates with him. She has acknowledged she kissed and embraced him many times. He has stopped at her house often until the early morning hours. He has upon occasion "to protect her from her ex-husband" stayed all night. They have drunk together. She asserts nothing improper ever occurred unless the dating, kissing and embracing is so regarded. She testified, "We (Ladd) go to numerous parties, we do go out." This occurred "very often". They often stayed out late or all night. She stated, "A lot of instances Mr. Ladd stays very, very late. He might be there until two or three o'clock in the morning, and he will leave and I have had calls from him as early as four o'clock in the morning, and he said, 'Can I come over and have breakfast?' And he would

show up at four-fifteen." Appellant stated she did not love Ladd and did not intend to marry him.

Most revealing is the following testimony of appellant: "I had a very difficult time the first summer (after the divorce) trying to find someone to stay with my children. I couldn't get an older woman. I did have to depend on younger kids, and they weren't reliable, and I knew it. My mother was not able to help me, my father was sick. I asked my mother-in-law to watch them, she could not watch them. She wouldn't watch them, but she always found time to come out and cause trouble with my baby sitters. * * * I finally got a woman that lives in the neighborhood, a single woman, (Nadine Phillips) and she comes up now. She has since Christmas. She stays with the children and she also takes care of my house for me."

However, Mrs. Phillips does not come in until after lunch and stays until dinner which she prepares. Two or three times a week appellant doesn't come home from work and Mrs. Phillips has to arrange for a baby sitter. On several occasions she has had to stay all night and appellant would come in about 4:00 a. m. or later with Mr. Ladd who would stay after Mrs. Phillips left. If appellant goes out at night she has sitters. She now has a lady friend also living with her, an Elaine Jarrett.

Mr. Ladd testified he conducted himself "completely and totally properly", and that he has no intentions of marrying appellant.

While the above is far from a complete statement of the testimony it is sufficient to paint the general picture which confronted the trial court and now confronts us.

There is no dispute concerning the applicable law. Both sides agree the supreme and paramount consideration is the welfare of the children. Section 452.120 RSMo 1959, V.A.M.S. Both sides cite and rely on such cases as Paxton v. Paxton, Mo. App., 319 S.W.2d 280; Wilson v. Wilson,

Mo.App., 260 S.W.2d 770; and Pippas v. Pippas, Mo.App., 330 S.W.2d 132.

Child custody litigation always presents a serious and heart rending problem to the court. No nice mathematical formula or self-operating slide rule exists by which it can be determined what is best for the welfare of the children. An understanding and careful judgment is required, and each case must be judged on its own particular facts. Our duty is to consider, weigh and evaluate all the competent evidence. We are not bound by the trial court's findings but do accord them proper deference, particularly where the credibility of witnesses is involved. We do not lightly disturb the trial court's judgment and will defer to it unless we are convinced that the welfare of the children requires some other disposition.

Respondent as the party seeking the change of custody has the burden of showing by a preponderance of the credible evidence changed facts and circumstances to a substantial and material extent which in the best interests of the children require modification of the custodial provisions of the original decree. Hurley v. Hurley, Mo.App., 284 S.W.2d 72.

By the original decree appellant was adjudged to have been the innocent and injured party and the custody of the four children was awarded to her. We commence with the presumption the children were then with the right party because that is where the court placed them. S——— v. G———, Mo.App., 298 S.W.2d 67, 77. In the instant case this is strengthened by the rule that all things being otherwise equal it is presumed the proper place for children of tender years is with their mother.

We acknowledge the general rule that the fact a mother is guilty of adultery does not necessarily disqualify her to have custody of her children. The moral unfitness of a mother must have a bearing on the welfare of the child before it can be

sufficient to deprive her of her custody. 17A Am.Jur., Divorce and Separation, Sec. 820, p. 16.

◼ Without arguing the rather clear evidence, or going through an itemized evaluation of it, we state our conclusion that it fully supports the action of the trial court. This evidence convinces us, as it did the trial court, that since the divorce and at the time of the hearing these four children were not receiving proper care and were being exposed to substantial immoral and debasing influences through the misconduct of their mother in their presence. As the record now stands it is to the best interest and welfare of these children to change their custody.

◼ It is the general rule that unless both parents are unfit, custody is ordinarily granted to one or the other of them. Paxton v. Paxton, supra. Custody is not to be placed in a grandparent or any third person except as a necessary expedient, and usually as a temporary expedient until one of the parents becomes physically, economically and morally capable of having custody. Wilson v. Wilson, Mo.App., 260 S.W.2d 770; Neustaedter v. Neustaedter, Mo.App., 305 S.W.2d 40.

◼ We think the record justifies the placing of the custody of these four children with the paternal grandmother. We note the father is also a member of that household. He has not appealed or objected to the trial court's judgment. The mother in the past to some extent has believed the grandmother to be a suitable person for at least their temporary custody as she has sought her assistance in their care.

Whether this custody in the paternal grandmother will be permanent or merely temporary is a matter that can be left safely with the trial judge who will act in accordance with the established rules and the facts as they may be presented to him at some future date. He continues to have full jurisdiction. It is to be hoped, of course, that this mother, once found to be the proper one to have the children's custody, will put her house in order, both physically and morally, for the welfare of these children she professes to love.

The judgment is affirmed.

All concur.