W_____ J_____ I_____,
**Respondent,**

v.

D_____ E_____ I_____,
**Appellant.**

**No. KCD 26875.**

Missouri Court of Appeals,
Kansas City District.

May 5, 1975.

James J. Wheeler, Keytesville, for appellant.

David Thomas, Carrollton, for respondent.

Before SOMERVILLE, P. J., PRITCHARD, C. J., and TURNAGE, J.

PRITCHARD, Chief Judge.

On May 10, 1972, the court entered a decree of divorce to respondent wife, but granted the *temporary* care, custody and control of a minor son born of the marriage to her "pending investigation of both plaintiff and defendant by the welfare department." On July 13, 1973, after further evidence was presented pertaining to the custody of the minor child, "together with written reports prepared by the welfare offices of both Carroll County and Greene County, Missouri, regarding the suitability of the homes of both plaintiff and defendant for said minor child," the court entered its final decree awarding its general care, custody and control to the wife, except for certain times on weekends when the husband was to have him. Notice of appeal was filed July 20, 1973. The judgment became final after July 13, 1973, for purposes of appeal as all issues were then disposed of, which under the cases prevents piecemeal appeals. See the factually analogous case of Green v. Green, 240 S.W.2d 741 (Mo.App.1951), where under the then rule an appeal was dismissed as premature because the judgment, although granting a divorce, did not dispose of matter of child custody which had been, as here, taken under advisement by the court. See also Allcorn v. Allcorn, 241 S.W.2d 806, 810[1, 2] (Mo.App.1951).

The husband claims (1) that his conduct upon which the wife based her cause of action for divorce had been condoned by her, and that the evidence of general indignities offered by him showed him to be the innocent and injured party; and (2) that the competent and credible evidence in the case showed that the welfare and best interests of the minor child would be better promoted by awarding his custody to the husband.

The wife's petition for divorce was filed September 13, 1971, and alleged that the husband on "numerous occasions last past" had physically assaulted her; that he was possessed of a vile and ungovernable temper and constantly argued with her; and that he consumed intoxicants to an excessive degree. In his cross-bill for divorce, the husband alleged that the wife was quarrelsome and abusive toward him; she told him she no longer loved him; and that the wife did not properly care for their home or prepare him meals regularly; and that she did not properly care for the child born of the marriage.

According to the wife, the parties lived together until November 21, 1970, at which time the husband beat her up pretty badly with his feet and hands causing bruises on her back and head. At that time he was drinking "pretty bad." The beating was precipitated by an argument about their unmodern house. The following Monday, the wife went back to husband and continued "to cohabit and live with him" until September 10, 1971. In the latter month the husband struck her, was drinking "and he wasn't at home at nights like he should be." The wife lived with her parents for a time after the separation in 1971. In this posture, the husband claims that there was a condonation by the wife of his conduct occurring, as he says in November, 1970, after which the wife went back to him. The claim overlooks the testimony of the wife as to the husband striking her in September, 1971, after which the parties parted company. These facts have the effect of reviving the original November, 1970, grievance. Schuler v. Schuler, 290 S.W.2d

192, 197[7] (Mo.App.1956). The whole of the evidence in this respect is conflicting, and deference must be therefore accorded the trial court in the resolution of the issue. Cox v. Cox, 488 S.W.2d 275, 276[1–4] (Mo.App.1972). The trial court did not err in granting a decree of divorce to the wife upon her evidence, and of course the court was not required to believe the evidence of the husband as to his exemplary conduct during the marriage.

 On the original hearing, the testimony concerning the fitness of the parties to have custody of the minor child was this: The parties lived in a trailer home, which was not modern, near the husband's parents. The wife had to carry the water from outside to it, and the husband did not help her. According to the husband, the wife took care of the baby very poorly, letting him go for hours with dirty and wet diapers. She did not keep the house clean. If he were awarded custody of the child, the two would have lived with his parents who had a five room modern home on 5 acres. The husband had a younger brother, age 21, who also lived with his parents.

The husband's uncle testified that he visited the home of the parties on two occasions. On the first occasion he saw clothes piled on the divan and the living room was more or less a shambles. In the kitchen there were dishes piled on the table and stove. The baby was dirty and wet, and was not changed for three hours that he was there. Later he visited the trailer home which was on the 20 acres owned by the husband's parents specifically to see the baby. The house was dirty and there were dishes sitting around on the cabinets. The baby was dirty and had not been changed for some time—it was soured and had a bad odor. The aunt testified also to the effect that the house was a mess.

The husband's father testified that the house was always dirty and filthy; that the wife took no care of the house, did not cook meals, and left dishes and food out. He had seen the child wear the same diaper for 24 hours. The husband's mother's testimony was also that the home was filthy, with dead mice on the floor, and the child was not cared for.

The wife's school records were produced showing that her I.Q. tests given her on two occasions showed 79 to 62. The State Department of Education standard is that an I.Q. of 59 to 78 is the classification for "educable mental retarded." She dropped out of school at the age of 16 after 6 years in a specialized class. Her father testified that the type of education was for sewing, cooking and care of a home.

Deputy Sheriff Edson was called to the wife's parents' home in Carroll County concerning the husband's visitation privileges. He saw the baby and it appeared to him to be well and cared for.

The wife denied that she ever let the baby go dirty. It was not easy keeping the unmodern house because she had to carry water, and the husband did not assist her in any way. She denied that there was a dead mouse on the floor of the home as testified to by the husband's mother.

On the husband's motion, the court ordered the wife to submit to a physical and mental examination pursuant to § 510.040, RSMo 1969, V.A.M.S. (and Rule 60.01 V.A.M.R.). The wife did so, and although there was a request, no report of the examining physicians was supplied to her.

The hearing was resumed on May 29, 1973, and the testimony, more relevant in point of time to the court's final order of custody and thus to the fitness of the parties to have the custody of the child, showed these facts: The husband's parents were steadfast in their desire to care for the child in their home where the husband

still resided. During the weeks after December, 1972, when the child was visiting the husband in their home, the child used "just terrible language. It is just sickening. It makes you sick to listen to the language that the child uses." On visits, the child did not have more than one change of clothing sent with him for a weekend. The clothes were ripped and many times they were "damp and moldy smelling," and never ironed, but the child was ordinarily clean. The parent's other son no longer lived in their home in May, he having married. During the time that the child had been visiting the husband in his parent's home, he had grown to really enjoy his father, and the child was cheerful in the home and having a good time. He was never mistreated and there were no disciplinary problems.

For a time before she remarried, according to her father, the wife lived with her parents. She did not work because it took all of her time to take care of the child. The wife then went to church every Sunday.

The husband testified that when he picked up the child for weekend visits, his clothing was very dilapidated, the material was roughed up as a dryer would do if left in it too long. The clothes were often damp and had a foul odor about them, "a smell of a doggy smell." The child's hair was never combed, and there was dirt behind his ears and in his ears on one occasion. When it was time to return the child to the wife, the child never wanted to go. The child would live with the husband, if he got custody, in his parents' home which he described as immaculate, and his mother was an extraordinarily good cook. On cross-examination, the husband testified that he was interviewed by a Greene County welfare caseworker, and a home study was made; that if she gave a good report of him and his parents and the home, he would agree with it. Conversely, by the same token, if the Carroll County welfare caseworker made two home studies and gave the wife and her present husband a good report and recommendation, "You would say that they are honest in their situation, is that correct? A. I certainly couldn't call the Welfare crooked. I wouldn't do that." The husband would expect his mother to take the place of the wife as far as seeing after the child, cooking, washing and mending his clothes. If he no longer lived with his parents, and was remarried, whoever he married would care for the child while he was at work.

On behalf of the wife, her mother testified that she saw and visited with the child in the wife's home about once a week. The wife kept a good house, prepared adequate meals for the child, and kept him clean. She had never seen the child when his clothing needed repairing, nor did she see anything to indicate that he was neglected.

The wife's present husband testified that he married her on December 2, 1972. He was buying a home, was employed as a school maintenance man at about $322.00 per month. The child had been living with them since the marriage in the four room and a bath home which he has remodelled. He has got along well with the child who goes to church with them and out to play. The wife fixed the meals, did the cleaning and laundry in the home for all of them, including the child. The present husband did not drink and no profanity was used in the home. The wife disciplined the child when he deserved it, but did not abuse him. She did not allow him to run filthy, but cleaned him up right quick. The wife read intelligently, including newspapers a lot, and the recipes for food she made.

The wife testified that the child and her present husband got along well. She used the child support payments for the child. She kept the house clean and the child clean, bathing him every day.

Elliott Carr, a special investigator employed by the husband, visited the wife's home prior to her remarraige. He described the house as "just a normal farm home."

The facts set out above are rather detailed because the husband makes an attack on the court's use of Division of Welfare reports, which he says offends *Flickinger v. Flickinger*, 494 S.W.2d 388 (Mo.App. 1973). That case is distinguishable because here the trial court's adjudication of the matter of custody does not depend *solely* upon the investigative reports. The trial court did not delegate its power and duty to resolve the matter to the Division of Welfare caseworkers. There is sufficient evidence in the record, above set forth, to support the court's award of general custody of the child to the wife. It shows her present situation to be quite stable (there is no evidence to the contrary), and that the child is being well cared for. Any conflicts in the testimony in that respect were for the trial court to resolve. E—— (S——) v. E——, 507 S.W.2d 681, 683[2] (Mo.App.1974), and cases cited. The welfare reports are merely corroborative of the evidence in the case as to the respective conditions of the parties. Note also that the husband conceded that the welfare reports would not be inaccurate. The question before the court under *Cascio v. Cascio*, 485 S.W.2d 857, 859 (Mo.App. 1972), was what order of custody of the child, in its best interest and welfare, should be made. In that determination, the trial court has broad discretion. *Chilcutt v. Baker*, 384 S.W.2d 854, 860[6–8] (Mo. App.1964); *Paxton v. Paxton*, 319 S.W.2d 280 (Mo.App.1958). Clearly, under the evidence, the trial court did not abuse its discretion in awarding general custody of the child to the wife.

The judgment is affirmed.

All concur.